Submitted September 27, 2016, reversed and remanded January 11, petition for review allowed April 13, 2017 (361 Or 350)

In the Matter of A. J.-L. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. J. M.
and A. J. B.,
*Appellants.*

Lane County Circuit Court
14611J;
Petition Number 14611J01;
A161859

388 P3d 417

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Valerie Colas, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant S. J. M.

G. Aron Perez-Selsky filed the brief for appellant A. J. B.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Flynn, Judge, and DeHoog, Judge.

**DEHOOG, J.**

This case requires us to consider whether, before changing a child's permanency plan from reunification with parent to adoption under ORS 419B.476, a juvenile court must first determine, under ORS 419B.498(2)(b), that there are no compelling reasons to forgo a change. For the reasons that follow, we conclude that the court must first make that determination. We further conclude that, even though the juvenile court in this case determined that compelling reasons were not present, the record does not support that determination. Accordingly, we reverse and remand.

The judgment that mother and father separately appeal changed the permanency plan for their daughter, A. In changing that case plan, the juvenile court determined that the Department of Human Services (DHS) had made reasonable efforts to reunify A with mother and father, but that neither parent had made sufficient progress for A to safely return home. The court separately determined that there were no compelling reasons for DHS to defer filing a termination-of-parental-rights petition. On appeal, mother and father each assign error to the court's determination that they had made insufficient progress, and mother additionally assigns error to the court's compelling-reasons determination. DHS challenges all three arguments on their merits, but further contends that any error the juvenile court may have made in its compelling-reasons determination would not be reversible, because that determination relates to *when* a petition for termination must be filed, and not *whether* the permanency plan should change from reunification to adoption.

Neither mother nor father requests that we engage in *de novo* review, and we do not consider this an exceptional case warranting the exercise of our discretion to do so. *See* ORS 19.415(3)(b) (providing for discretionary *de novo* review in equitable actions); ORAP 5.40(8)(c) (*de novo* review is reserved for exceptional cases). "Accordingly, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome."

*Dept. of Human Services v. D. A. N.*, 258 Or App 64, 65, 308 P3d 303, *rev den*, 354 Or 490 (2013). We state the facts in accordance with that standard.

Mother and father entered into a relationship in September 2013. In October 2014, while mother was pregnant with A, DHS removed A's half-brother, L, from mother's care due to a report that father had physically abused L.[1] In the incident involving L, father struck L four times, significantly bruising his buttocks. Mother and father initially claimed that L had fallen down the stairs, but later acknowledged that father had "spanked" L. DHS filed a petition alleging L to be within the jurisdiction of the juvenile court as a result of those circumstances. The juvenile court took jurisdiction, and DHS placed L in relative foster care with his maternal aunt.[2]

In November 2014, mother gave birth to A, and DHS immediately filed a petition alleging jurisdiction as to her. In December 2014, the juvenile court took jurisdiction based on allegations that (1) mother lacked the parenting skills to safely parent A; (2) mother had failed to protect A's half-sibling, L, from further abuse, despite being aware that father had physically abused him; (3) father had physically abused L; (4) father lacked the parenting skills to safely parent A; and (5) father suffered from a mental-health condition that interfered with his ability to parent.[3]

The court's dispositional judgment designated reunification with parents as the primary case plan for A and ordered mother and father to comply with DHS's action plan. The court specifically ordered parents to obtain psychological evaluations, to participate in both counseling and parenting training and demonstrate the skills they learned, and to maintain safe and stable housing. The court committed A to

---

[1] A's father is not L's legal or biological father.

[2] DHS alleged that mother (1) lacked the parenting skills to safely parent L, (2) failed to adequately supervise L, and (3) was aware that L had been physically abused by her live-in partner, but had failed to protect L from further abuse. The juvenile court took jurisdiction as to the first and third allegations.

[3] Specifically, the record reflects that, among other conditions, father met the diagnostic criteria for post-traumatic stress disorder (PTSD), which could make him "prone to irritability and aggressiveness or other distancing techniques or intimidation or aggressive behavior."

the legal custody of DHS but, after establishing an in-home safety plan, placed A with mother.[4]

In January 2015, DHS moved to modify that placement by removing A from mother's care and placing her in foster care, on the ground that mother had failed to comply with the safety plan. The juvenile court granted DHS's motion and allowed DHS to place A in relative foster care with her maternal aunt, together with L. At that time, the permanency plan remained reunification.

In January and February 2016, in accordance with ORS 419B.470(2), the juvenile court held a contested permanency hearing that resulted in the case plan at issue in this appeal.[5] DHS asked the court to change A's permanency plan from the primary plan of reunification to the concurrent plan of adoption. Mother and father opposed that change, with both parents seeking, among other things, an unspecified extension of time to continue with services.

At the hearing, the parties presented evidence that mother had engaged in substantial efforts pursuant to DHS's action plan and had made progress toward meeting DHS's parenting goals. According to DHS's court report,[6] mother had shown consistent engagement in individual and family therapy sessions. DHS's report also noted that "improvements [had] been noticed in [mother's] parenting abilities."

The court heard testimony that showed, among other things, that mother had participated in mental-health therapy, learned to regulate her emotions, impulsive responses, and anxiety, and successfully completed a parenting program, thereby improving her parenting skills. Additionally, the evidence showed that mother had participated in family counseling and had attended a toddler bonding class with A. Mother's family therapist, Calisch, reported that mother was bonded with A and that she was open to feedback and

---

[4] At the time of the jurisdictional hearing, mother and father were living separately.

[5] The court held a permanency hearing regarding L at the same time. The permanency judgment for L is the subject of a separate appeal.

[6] DHS's report was received into evidence without objection.

had accepted responsibility for her part in L's abuse. The supervisor of the bonding class, Keen, testified that mother had been appropriately attentive to A and met A's physical needs.

Despite mother's progress, the evidence showed that she had not fully addressed the concerns that gave rise to jurisdiction. For example, mother was determined to preserve her relationship and coparent with father, even though he had abused L. Mother's focus on her relationship with father hindered her progress as a parent. As mother's caseworker, Gould, explained, by prioritizing her relationship with father, mother had shown that, despite having improved her parenting skills, she still did not fully understand her protective role. Gould testified that, even though mother sometimes recognized the threat that father posed to A, at other times, she was "very protective of [father] and not as much of her children." According to Gould, mother had placed father "before her children in several incidents," such as when she continually advocated for father to be allowed contact with L, even though L's therapist, Schnabel, had told her that the contact could harm L.

There was evidence that father, too, had engaged in services under DHS's action plan and had made progress toward meeting DHS's goals for him. DHS's court report noted that father had "shown positive parenting skills" with A. Keen also testified that father had interacted positively with A during the toddler bonding class, where father had been attentive and focused on A, responsive to her needs, and active in discussions. Father had also completed a program for young fathers, with "very good" attendance and a "very high[] level" of engagement in the program. The leader of that program, Carrasco, testified that father was "really looking to make amends" and that he had applied the skills he had learned, such as controlling his anger. Father's therapist, Clark, testified that, although his barriers to parenting had not been entirely resolved, father had shown a "great * * * amount of improvement in his emotional management, in his ability to see perceptions other than his own, and in recognizing additional parenting techniques that [were] beneficial to children." According to Clark, father

had developed "new insights" that he had "utilize[d]" during therapy sessions.

Father also testified at the permanency hearing. At times, father recognized the effect that his abuse had had on L and said that he would redirect L's negative behaviors differently in the future. At other times, however, father minimized or even denied the abuse. Father continued to call the abuse a "spanking" and testified that he "was taught * * * [t]hat you could spank a child with your open hand, um, to redirect—I mean, recorrect them to be safer. And here we are now." Father also continued to suggest that the bruise might have resulted from L falling down the stairs. Father testified that "[t]he bruise didn't come from the spanking," but clarified, "I'm not denying it [resulted] from a spanking. But I am not crediting it to a spanking [either]." When asked whether he took responsibility for L's injury and removal from the home, father responded, "I'm taking credibility that you guys are saying that it's me that's the reason [that L was taken from the home]. * * * I disagree that he should still be out of our home." Father also expressed his belief that, during the course of his involvement with DHS, "people * * * changed things to alter the wording and things to make them seem more dramatic than what they actually were."

There was testimony that father continued to have problems regulating his emotions. Gould testified that father would "become[] very agitated and angry and get[] threatening verbally" and that she had "safety concerns mostly around [father's] emotional regulation around the kids." Schnabel testified that he had met with father and that father had "a significant amount of emotional [lability] * * * [and] also a significant degree of anger." Schnabel testified that father had become "really mad after the session [in which he met with father] and kind of lost control of himself."

Father had several emotional outbursts during the hearing itself, causing the court to remind him to follow instructions and not to interrupt the proceedings. At one point, when father was being particularly disruptive, the court took a break to allow him to speak with his attorney

outside. During the break, the court could hear father yelling in the hallway from inside the courtroom. After that break, the court noted that father "tend[ed] to get very agitated very quickly." The court also asked Carrasco, who had testified that father had learned to manage his anger, if he would "expect [father] to yell out in the lobby so that the Court could hear it inside if he were applying the skills he learned during your class." That witness acknowledged that he would not have expected father to exhibit such behavior.

In addition to evidence specific to each parent, other evidence at the permanency hearing revealed that, in June 2015, approximately eight months before the hearing, mother and father had married without informing DHS, their service providers, or the court. At the time of their marriage, DHS had believed that mother and father were living separately and no longer in contact with each other. Mother initially hid the marriage from DHS out of concern that it would impair her chances of regaining custody of her children. Father, on the other hand, testified that he had not purposely kept his marriage to mother secret and that he "didn't care" if DHS knew about it. However, like mother, father had not voluntarily disclosed the marriage to DHS.

At the time of the hearing, mother and father were living together in father's travel trailer. Their relationship was volatile, and, as mother told her therapist, they would "get into it with each other *** arguing back and forth. Yelling." And, despite DHS's expectation that mother obtain safe and stable housing, mother had not completed the "Second Chance" renter's rehabilitation program to which she had been referred. Mother maintained, nevertheless, that she was willing to live separately from father if the court felt that was necessary for her to safely parent her children. However, in Gould's opinion, it was "very difficult to believe that would be true *** since [mother] has not been honest *** throughout the case."

At the conclusion of the hearing, the juvenile court changed A's permanency plan from reunification to adoption. Because the merits of parents' arguments on appeal turn on whether the court properly applied the statutes

governing permanency decisions, we pause for a moment to review those provisions.

When a child under juvenile court jurisdiction is in substitute care, the court must hold permanency hearings periodically, or upon request by an interested party, to determine the appropriate, ongoing permanency plan for the child. ORS 419B.470.[7] Permanency hearings are governed in part by ORS 419B.476(2)(a), which provides, in part:

> "If the case plan at the time of the hearing is to reunify the family, [the juvenile court must] determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Under this provision, a child's plan may be changed from reunification to adoption only if the party seeking that change satisfies the juvenile court that "(1) DHS made reasonable efforts to make it possible for the child to return home safely *and* (2) the parent has not made sufficient progress for that to occur." *Dept. of Human Services v. R. S.*, 270 Or App 522, 527, 348 P3d 1164 (2015) (emphasis in original; internal quotation marks omitted).

Within 20 days after the permanency hearing, the court must enter an order setting forth the specific determinations made at the hearing. ORS 419B.476(5). The determinations that must be in the order include, in relevant part,

---

[7] ORS 419B.470(2) requires the court to conduct a permanency hearing "no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is the earlier." Following the initial permanency hearing, the court must conduct "subsequent permanency hearings not less frequently than once every 12 months for as long as the child or ward remains in substitute care." ORS 419B.470(6). ORS 419B.470(5) further instructs the court to "conduct a permanency hearing at any time upon the request of [DHS], an agency directly responsible for care or placement of the child or ward, parents whose parental rights have not been terminated, an attorney for the child or ward, a court appointed special advocate, a citizen review board, a tribal court or upon its own motion," unless there is good cause to decline to hold a hearing.

"(b) The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"(A) The ward will be returned to parent; [or]

"(B) The ward will be placed for adoption, and a petition for termination of parental rights will be filed[.]"

ORS 419B.476(5).

In addition, if "the court determines that the permanency plan for the ward should be adoption," ORS 419B.476(5)(d) requires the court's order to include "the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable." The referenced statute, ORS 419B.498(2), provides exceptions to DHS's otherwise applicable deadline for filing a petition to terminate parental rights.[8] One such exception exists when

"(b) There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

"(A) The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c); [or]

"(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]"

ORS 419B.498(2).

Returning to the hearing in this case, the juvenile court determined that DHS had made reasonable efforts to reunify the family; neither parent challenges that ruling on appeal. The court further determined that, despite those efforts, neither mother nor father had made sufficient progress to allow A to safely return to either parent's care. Separately, the court summarily determined that none of the circumstances in ORS 419B.498(2)(b) were present.

---

[8] Unless an exception applies, DHS must file a termination petition when "the child or ward is in the custody of [DHS] and * * * [t]he child or ward has been in substitute care under the responsibility of [DHS] for 15 months of the most recent 22 months[.]" ORS 419B.498(1)(a).

In reaching its decisions, the juvenile court found that the testimony of Calisch and Clark was not "terribly helpful," because, in the court's view, it was biased and unclear. Contrary to the therapists' testimony, the court found that mother and father had "demonstrated an inability to implement skills learned." The court also expressly found that mother and father were dishonest, which made it difficult for the court to assess their "ability to protect [A] and ability to be safe." The court found it particularly concerning that both parents continued to refer to L's abuse as a "spanking." The court also noted that, although parents had demonstrated some ability to follow directions while under close supervision, "once out of direct supervision, they return[ed] to conduct of their own choosing, regardless of whether it is not in their child's best interest." The court further observed that mother and father's relationship with DHS during the life of the case was "not the best" but, based on its comments to the parties, it does not appear that the court focused its assessment on that relationship.

The permanency judgment included specific findings as to each parent. As to mother, the court found:

"[Mother] continues to struggle with accountability and honesty, in ways directly related to the bases of jurisdiction. Mother lacked emotional regulation during the hearing. She lacks an awareness of the risks posed by Father and continues to put her relationship with Father before the best interest of her children. Mother has participated in some services. She has yet to recognize how her conduct and behavior caused this child and the child's half-sibling to come into care. The circumstances and conditions that caused the child to come into care and that form the bases of jurisdiction as to Mother have not been ameliorated. The Court finds that the child cannot be safely returned to Mother's care in a reasonable time."

As to father, the court found:

"He was combative during his testimony. The Court does not find Father credible. He disrupted his attorney throughout the hearing. He was given the opportunity to take a moment to speak with his attorney outside of the courtroom and could be heard by the court yelling in the lobby

while the parties remained inside the courtroom.[9] He then raised his voice when he returned to Court. Throughout the hearing he has lacked the ability to regulate his emotions and temper. One of the bases of jurisdiction as to Father is physical abuse of a child. However, Father is unwilling to admit that his conduct amounted to abuse. * * * Father has participated in some services. He has yet to recognize how his conduct and behavior caused this child and the child's half-sibling to come into care. The circumstances and conditions that caused the child to come into care and that form the bases of jurisdiction as to father have not been ameliorated. The Court finds that the child cannot be safely returned to Father's care in a reasonable time."

Mother and father now appeal the judgment changing the permanency plan to adoption. Although neither parent challenges the juvenile court's determinations that DHS made reasonable efforts, both parents argue that the court erred in determining that they had not made sufficient progress to make it possible for A to safely return home. *See* ORS 419B.476(2)(a). Mother additionally argues that there were two compelling reasons—specifically, her participation in services that would make it possible for A to return home within a reasonable amount of time and the bond that she shared with A—for the court to forgo a change of plan, and that the court erred in determining otherwise. *See* ORS 419B.498(2)(b)(A), (B).

DHS responds that the juvenile court's determinations are supported by evidence in the record. DHS further contends that, even if the court erred in determining that no compelling reasons were present, any error in reaching that determination would not be reversible, because the compelling-reasons determination relates to *when* a petition for termination must be filed, and not *whether* the permanency plan should change from reunification to adoption.

We first address the contentions that the juvenile court erred in determining that mother and father had not made sufficient progress to make it possible for A to safely return home. We begin with the court's determination as to

---

[9] Father did not object to and does not challenge the court's consideration of that conduct.

father. On appeal, we understand father to make two arguments. First, father observes that there was no evidence that he had been hostile or inappropriate toward A and argues, therefore, that the court based its determination that father could not be a safe resource for A on impermissible speculation—namely, that his hostile attitude toward DHS would extend to his child. Second, father argues that, because his service providers praised his participation in court-ordered services, as well as his improved emotional regulation and parenting skills, the evidence at the hearing was legally insufficient to support the determination that he had not made sufficient progress for A to safely return home. DHS acknowledges that there was no evidence that father had exhibited threatening behavior toward A, but suggests that the court was permitted to infer from father's emotional outbursts in other contexts that his temperament presented a continued risk of harm to his child. In support of that contention, DHS notes that, even though father had engaged in services to address his emotional lability, he continued to display the anger and volatility that had led the court to take jurisdiction in the first place. In light of our standard of review, we reject both of father's arguments.

We conclude, instead, that the juvenile court's findings of fact are supported by evidence in the record and that the court did not err in determining that father had made insufficient progress. That is not to say that father's hostile attitude, in isolation, would support the conclusion that he posed a risk of harm to A. *See State ex rel Dept. of Human Services v. Rodgers*, 204 Or App 198, 221, 129 P3d 243 (2006) (in the context of termination proceedings, a parent's hostility toward DHS, "standing alone, is not evidence of conduct or a condition seriously detrimental *to [the] child*" (emphasis added)); ORS 419B.504 (providing that parental rights may be terminated "if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child"). Here, however, father's relationship with DHS was not the only support for the court's conclusion. Instead, it was father's hostile and disruptive behavior during the hearing, as well as his combativeness during his testimony, that demonstrated to the court that father "lacked the ability to regulate his emotions and temper" and

that he had not ameliorated the related bases of jurisdiction as to A. That was not speculation, but a permissible inference based upon father's exhibited behavior. *See State ex rel Juv. Dept. v. J. L. M.*, 220 Or App 93, 95, 120, 184 P3d 1203, *rev den*, 345 Or 158 (2008) (concluding, on *de novo* review, that the "[f]ather's problems in managing anger are evident * * * in his conduct during trial, a time when he reasonably would be expected to be on his best behavior" and that the "father's anger management issues would prevent him from meeting [the] child's needs and thus are seriously detrimental to [the] child").

Similarly, we disagree with father's second contention that, because he had successfully followed through with DHS's service requirements, the juvenile court was compelled to conclude that he had made sufficient progress to allow A to safely return home. "[A] parent's mere participation in services * * * is not sufficient to establish adequate progress toward reunification. Rather, ORS 419B.476(2)(a) requires us to focus on the child's health and safety." *Dept. of Human Services v. S. N.*, 250 Or App 708, 718, 282 P3d 901, *rev den*, 352 Or 564 (2012) (ellipses in original; internal quotation marks omitted). Thus, "[e]ven if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made sufficient progress to make it possible for the child to return home." *Dept. of Human Services v. G. N.*, 263 Or App 287, 297, 328 P3d 728, *rev den*, 356 Or 638 (2014); *see R. S.*, 270 Or App at 528-29 (a determination that a parent has made "sufficient progress" toward meeting expectations of DHS is not necessarily inconsistent with the determination that the parent has not made sufficient progress for purposes of ORS 419B.476(2)(a)).

Based, in part, on firsthand observations, the juvenile court reasonably inferred that father's anger issues persisted, despite his apparently sincere efforts to address them through therapy and parenting training. The record further supports the conclusion that those anger issues directly affected father's ability to parent A. Again, the jurisdictional bases related to father were that he had physically abused A's half-brother, L, that he lacked parenting

skills, and that he suffered from a mental-health condition—specifically, PTSD that could result in irritability and aggressiveness—that interfered with his ability to parent. And, at the time of the permanency hearing, father continued to exhibit explosive behavior and beliefs that demonstrated that those problems remained unresolved. As noted, Gould testified that father became angry, agitated, and threatening when discussing A, and Schnabel similarly observed that father continued to have "a significant degree of anger [and] *** emotional [lability]." Notably, that behavior was not limited to father's interactions with DHS, but also occurred within the family unit, where mother and father admittedly had a volatile relationship and would "get into it with each other." Those ongoing behaviors, combined with the evidence that father was hesitant to acknowledge that his treatment of L constituted abuse and that he failed to recognize how that conduct had resulted in A's removal from the home, gave ample record support to the court's conclusion that father had not ameliorated the circumstances that had caused A to come into care. *See State ex rel DHS v. Kamps*, 189 Or App 207, 215, 74 P3d 1123 (2003) (injury to child while in care of father raised reasonable likelihood that child's half-sibling could suffer harm in the future as well).

We turn to the juvenile court's determination that, like father, mother had not made sufficient progress under ORS 419B.476(2)(a). Like father, mother suggests that her participation in the services required by DHS and her improved parenting skills necessarily meant that A could safely return home. In essence, mother argues that her desire to reintegrate father into the family could not support the conclusion that there remained a current threat of serious loss or injury to A—*i.e.*, that she had not ameliorated the bases for jurisdiction. *See* ORS 419B.100 (providing circumstances under which juvenile court may take jurisdiction); ORS 419B.476(2)(a) (requiring determination as to whether a parent has made sufficient progress to allow child to safely return home). DHS counters that, by prioritizing her relationship with father, mother demonstrated that, despite her participation in services, she remained unable to recognize the danger that father posed to A and to protect her from it. We agree that those circumstances, together with the

other evidence discussed below, support the court's determination that mother was unable to adequately protect A. Accordingly, the juvenile court did not err in concluding that mother had made insufficient progress for A to safely return home.

For its part, DHS does not dispute that mother engaged in a number of services and made meaningful progress toward DHS's goals for her. As previously explained, however, it is not dispositive that a parent has satisfied DHS's expectations by participating in services; what matters under ORS 419B.476(2)(a) is whether the parent has made sufficient progress, as a result of those services or otherwise, to overcome the concerns that gave rise to juvenile court jurisdiction. *S. N.*, 250 Or App at 718; *Rodgers*, 204 Or App at 221-22. Here, the juvenile court determined that mother had not made sufficient progress to alleviate those concerns, and the record supports that ruling. For example, to support the finding that mother continued to "lack[] an awareness of the risks posed by Father and continue[d] to put her relationship with Father before the best interest of her children," there was evidence that mother had married father despite her belief that the marriage would impair her ability to regain custody; that, on several occasions, mother put father's interests over her children's; and that mother had not completed a program that would have helped her obtain housing independent from father. And, because mother's failure to protect L from father was one of the bases for jurisdiction, her efforts to expose L to father against the advice of L's therapist further supported the concern that mother would expose A to harm. *See Kamps*, 189 Or App at 215. Thus, the court did not err in determining that mother had not ameliorated the circumstances that caused A to come into care and that A could not safely be returned home.

We turn, finally, to mother's contention that the juvenile court erred in changing the permanency plan for A to adoption, because there were compelling reasons that filing a petition for termination of parental rights would not be in A's best interests. *See* ORS 419B.498(2)(b). As noted earlier, when a court determines at a permanency hearing

that the case plan should be adoption, ORS 419B.476(5)(d) requires the court to enter an order that includes "the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable." In relevant part, those circumstances apply when there is "a compelling reason * * * for determining that filing such a petition would not be in the best interests of the child or ward." ORS 419B.498(2)(b). Once more, under that provision,

"[s]uch compelling reasons include, but are not limited to:

"(A)  The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c); [or]

"(B)  Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]"

*Id.*

Mother's contention relies on the premise that ORS 419B.476(5)(d) and ORS 419B.498(2)(b) operate together to limit the juvenile court's authority to change a permanency plan to adoption. Under that view, those provisions collectively require the court to determine that there are no compelling reasons *not* to proceed with terminating a parent's rights *before* changing the plan. And, according to mother, even though the permanency judgment in her case reflects the juvenile court's ruling as to "whether one of the circumstances in ORS 419B.498(2) [was] applicable"—and states its determination that none were—the record does not support that determination.

DHS's response is twofold. On the merits, DHS argues that evidence in the record supports the juvenile court's compelling-reasons determination, and, therefore, the court did not err in changing the plan. Procedurally, DHS argues that the court was not required to make the compelling-reasons determination as a condition of changing the plan to adoption. Thus, in DHS's view, any error that the court may have made in that determination is not reversible error.

We take the procedural question first. That question requires us to consider whether the juvenile court's determination, under ORS 419B.476(5)(d), of "whether one of the circumstances in ORS 419B.498(2) is applicable," controls the court's authority to change a permanency plan from reunification to adoption. As always, our goal in construing the relevant statutes is to determine the legislature's intent, with the best evidence of that intent being the text of the statutes in context. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We consider legislative history if it is helpful to that inquiry and, if necessary, resort to maxims of statutory construction. *Id.* at 172-77. Applying that framework, we agree with mother's reading of the statutes.

The statutory text does not expressly condition the decision to change a plan from reunification to adoption on the juvenile court's determination that there are no compelling reasons to defer termination proceedings. *See* ORS 419B.476. The text of ORS 419B.476(5) requires the court to "enter an order within 20 days after the permanency hearing" that includes various determinations made by the court. Paragraph (d) of that subsection lists one such determination, as follows:

"If the court determines that the permanency plan for the ward should be adoption, the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable."

ORS 419B.476(5)(d). Notably, nothing in that paragraph, or in ORS 419B.476 as a whole, expressly conditions the court's permanency decision on the outcome of its determination under ORS 419B.498(2). As relevant here, the only express mandate under ORS 419B.476's permanency provisions is that the court enter an order reflecting the outcome of that determination. *See* ORS 419B.476(5)(d).

In turn, the plain text of ORS 419B.498(2) merely provides exceptions to DHS's usual timeline—as set forth under ORS 419B.498(1)—for filing a termination-of-parental-rights petition and undertaking adoption efforts. As noted, subsection (2) states that DHS "shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless," among

other exceptions, "[t]here is a compelling reason * * * for determining that filing such a petition would not be in the best interests of the child or ward." ORS 419B.498(2)(b). As set out above (and relied upon by mother), paragraph (b) also describes certain circumstances that constitute "compelling reasons" as a matter of law. ORS 419B.498(2)(b). And, as with ORS 419B.476, the text of ORS 419B.498(2) does not expressly state that the existence of compelling reasons under that subsection forecloses—or affects in any way— the juvenile court's authority to change the plan under ORS 419B.476.

Turning to case law considering how the two statutory provisions work together, we note that in other appeals— but interestingly, not in this one—DHS has contended that the matter was put to rest by our decision in *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 284 P3d 1233, *adh'd to as modified on recons*, 253 Or App 600 (2012), *rev den*, 353 Or 445 (2013). *See, e.g., D. A. N.*, 258 Or App at 70 (noting state's argument, under *D. L. H.*, that there is no statutory requirement that the juvenile court find that reunification will not be possible within a reasonable time before changing permanency plan to adoption, but finding it unnecessary to reach that argument given the court's implicit finding to that effect). And, to the extent that DHS adheres to the view that the matter is settled, there is language to support its position in our case law. *See Dept. of Human Services v. A. D.*, 255 Or App 567, 579, 300 P3d 185, *rev den*, 354 Or 342 (2013) (citing *D. L. H.* and stating that "[t]he juvenile court was not required to make a finding [regarding compelling reasons under ORS 419B.498(2)] *before* changing the permanency plan from reunification to adoption" (emphasis in original)). We conclude, nonetheless, that *D. L. H.* does not control here.

In *D. L. H.*, the juvenile court took jurisdiction over two children after their mother, who had a long history of drug and alcohol abuse, got into an altercation while apparently intoxicated and holding her child. 251 Or App at 790-91. As a result of that altercation, the mother was prosecuted and received a 22-month prison sentence, most of which she had completed by the time of her first permanency hearing. *Id.* at 791. Following that hearing, the juvenile court determined

that DHS had made reasonable efforts to reunify the family, but that the mother had not made sufficient progress for the children to safely return home. *Id.* at 794. The court further determined that, given, among other things, the mother's current imprisonment and her untreated substance-abuse issues, she was unlikely to make sufficient progress within a reasonable amount of time to enable her to regain custody. *Id.*

On appeal, the mother contended, in relevant part, that the juvenile court had erred in concluding that her children could not be returned to her within a reasonable time. *Id.* at 795. DHS's response was that it was not required to prove that the children could not be returned within a reasonable time. *Id.* We agreed, as follows:

> "As DHS contends, there is no statutory requirement under ORS 419B.476 or any other authority that requires the juvenile court to find that a parent cannot be reunited with the child within a reasonable time before the court changes the plan from reunification to adoption. * * * ORS 419B.476(2)(a), which lists the juvenile court's required determinations at a permanency hearing, does not require that kind of 'reasonable time' determination."

*Id.* at 805. Notably, however, even though our opinion states that no authority requires the court to consider whether reunification can occur within a reasonable time before changing the plan, it never mentions ORS 419B.476(5)(d) or ORS 419B.498(2)(b), much less analyzes whether those provisions might affect the broad conclusion quoted above.

Significantly, in *D. L. H.*, we noted that the juvenile court had specifically concluded that the mother was unlikely to make significant progress in a reasonable period of time. *Id.* at 806. Further, given the evidence of the mother's substance-abuse history and the testimony and report of her children's psychologist, the record in that case supported the court's implicit determination that, because her drug and alcohol treatment would take years, the mother could not provide a safe and nurturing home within a reasonable time. *Id.* at 792, 806. And it was for *that* reason that "we conclude[d] that the trial court did not err when it changed the permanency plan without ordering specific services for

mother and determined that mother and child could not be reunified in a reasonable time." *Id.* at 806.

As a result, our statement in *D. L. H.*, that the court was not required to make a reasonable-time determination before changing the permanency plan to adoption, was unnecessary to the outcome of that case; that decision, therefore, does not control our interpretation of the statutory provisions at issue in this case. *See Halperin v. Pitts*, 352 Or 482, 492, 494, 287 P3d 1069 (2012) (defining *"dictum"* as a statement not necessary to the outcome of the case and explaining that prior interpretations of statutes are not authoritative when they are *dicta*). We reach the same conclusion regarding *A. D.*, 255 Or App 567.[10]

More recently, we have assumed, without expressly deciding, that the determination under ORS 419B.498(2)(b), as to whether there is a compelling reason that filing a petition would not be in a child's best interests, *is* a prerequisite to a change of plan under ORS 419B.476. For example, in *Dept. of Human Services v. C. M. E.*, 278 Or App 297, 306, 374 P3d 969 (2016), a mother appealed a permanency judgment and argued that her participation in services and her child's bond with her were compelling reasons to forgo a change in plan from reunification to adoption. Although there was evidence that the mother had met DHS's expectations and had, with the assistance of DHS, developed a comprehensive safety plan that would facilitate reunification within about 60 days, the juvenile court determined that there was no compelling reason to delay filing a termination petition and changed the plan to adoption. *Id.* at 304-06.

In affirming the juvenile court, we concluded that the record supported its determination that the mother's participation in services was not a "compelling reason to forgo a change in plan to adoption under ORS 419B.498 (2)(b)(A)." *Id.* at 311. Further, after expressly assuming—

---

[10] Although the *A. D.* opinion expressly discusses both ORS 419B.476(5)(d) and ORS 419B.498(2)(b), it appears to regard the issue as settled by *D. L. H.* and does not engage in separate analysis. *See* 255 Or App at 579-80. Moreover, similarly to *D. L. H.*, in *A. D.* we noted that the juvenile court determined that the parents would not make sufficient progress "within a reasonable time" and concluded that the record supported that determination. *Id.* at 580.

again, without deciding—that a parent-child bond could qualify as a compelling reason to decline a change in plan, we likewise concluded that the record supported the juvenile court's conclusion that the bond in that case did not rise to that level. *Id.* at 311-12.

Notably, by concluding that neither the mother's participation in services nor the parent-child bond were compelling reasons "to forgo a change in plan to adoption" under ORS 419B.498(2)(b), our decision in *C. M. E. equated* the decision to file a petition under the termination statute with the permanency decision that the court must make under ORS 419B.476. *See id.* at 311; *see also Dept. of Human Services v. T. M. S.*, 273 Or App 286, 293-94, 359 P3d 425 (2015) (applying the "compelling reasons" determination under ORS 419B.498(2)(b) to decision to change permanency plan). *But see A. D.*, 255 Or App at 580 (concluding that the court's determination under ORS 419B.498(2)(b) relates only to the *timing* for filing a termination petition, and not to the substantive decision to change the permanency plan).

And, indeed, we have often noted the substantive implications of the court's compelling-reasons determination under ORS 419B.498(2)(b), lending further support to the argument that such a determination must precede a change in plan. As we explained in *Dept. of Human Services v. M. H.*, 266 Or App 361, 367, 337 P3d 976 (2014),

"[t]he requirement in ORS 419B.476(5) that the juvenile court make the determination under ORS 419B.498(2) after a permanency hearing reflects that 'the legislature has expressed its intent that the trial court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child.' *State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 183, 205 P3d 36 (2009). That 'child-centered * * * determination' under ORS 419B.498(2) requires the court to determine 'whether it is in the child's best interests *not* to file a petition for termination because the child can be returned home within a reasonable time.' [*Dept. of Human Services v.*] *C. L.*, 254 Or App [203,] 214[, 295 P3d 72 (2012), *rev den*, 353 Or 445 (2013) (emphasis added)]."

(Ellipses in original.) By our reasoning in *M. H.*, the determination under ORS 419B.498(2)(b), that filing a termination petition is not in a child's best interests, compels the conclusion that a change in plan to adoption is not the "one that is most likely to lead to a positive outcome for the child," *M. A.*, 227 Or App at 183 (internal quotation marks omitted), "because the child [based on the court's ORS 419B.498(2)(b) determination] can be returned home within a reasonable time," *C. L.*, 254 Or App at 214.

Returning to the text, context, and history of ORS 419B.476(5) and ORS 419B.498(2), we conclude that our approach to those two statutes in recent cases like *C. M. E.* best captures the legislature's intentions.[11] Once again, ORS 419B.476(5) dictates the content of the court's order following a permanency hearing and requires that it include the following: "(d) If the court determines that the permanency plan for the ward should be adoption, *the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable.*" (Emphasis added.) Paragraph (d) first appeared in substantially its present form in 2001, when it was codified as ORS 419B.476(4)(d) (2001). *See* Or Laws 2001, ch 686, § 16. Before then, the substantive interplay between the permanency decision under ORS 419B.476 and the compelling-reasons determination under ORS 419B.498(2)(b) was more explicit. The cross-reference to ORS 419B.498(2) first appeared in 1999 and provided,

> "*In making the determination* under subsection 5(b) of this section [*i.e.*, *whether* and when a child "will be placed for adoption, and a petition for termination of parental rights will be filed," ORS 419B.476(5)(b) (1999)], *the court shall determine* whether one of the circumstances in ORS 419B.498(2) is applicable to the case."

ORS 419B.476(6) (1999) (emphasis added); *see* Or Laws 1999, ch 859, § 15. The legislature enacted ORS 419B.498(2) that same year. *See* Or Laws 1999, ch 859, § 21. Thus, at the time that the legislature established the connection between the existing permanency statute, ORS 419B.476, and the new compelling-reasons provision under ORS 419B.498(2)(b), the legislature expressly required juvenile

---

[11] We also took a similar approach in *T. M. S.*, 273 Or App at 292-94.

courts to determine whether such circumstances existed "[i]n making the" determination that a child should be placed for adoption in the first place. ORS 419B.476(6) (1999). Or, stated differently, the compelling-reasons determination was, at that time, expressly part of the substantive decision to change the permanency plan to adoption, and not merely something to include in the court's order.[12] *See id.*

And, in our view, the legislature's later changes to the permanency statute do not reflect an intention to substantively alter the relationship between that statute and ORS 419B.498(2). In fact, the parallel structures of ORS 419B.476(5)(d) and two provisions enacted at the same time, paragraphs (e) and (f), support mother's construction. *See* ORS 419B.476(5)(d) - (f); Or Laws 2001, ch 686, § 16. When the legislature enacted paragraph (d), those nearby paragraphs provided, as follows:

> "(e) If the court determines that the permanency plan for the child should be establishment of a legal guardianship or placement with a fit and willing relative, [the order shall include] the court's determination of why neither placement with parents nor adoption is appropriate; [and]

> "(f) If the court determines that the permanency plan for the child should be a planned permanent living arrangement, [the order shall include] the court's determination of

---

[12] No party cited or submitted legislative history regarding ORS 419B.476 or ORS 419B.498. Nonetheless, we have reviewed the relevant aspects of that history. We note that there was considerable dispute between the Oregon Judicial Department (OJD) and DHS regarding the "-A12 amendment" to Senate Bill (SB) 408 (1999), which ultimately became ORS 419B.476(6)(1999). *See* Exhibit F, House Judiciary-Civil Law Committee, SB 408, June 16, 1999 (proposed amendments to A-Engrossed Senate Bill 408). The courts were eager to ensure appropriate judicial oversight regarding DHS's decision to file a termination petition, which would occur when the juvenile court reviewed the case plan, *i.e.*, at the permanency hearing. *See, e.g.*, Tape Recording, House Judiciary-Civil Law Committee, SB 408, June 16, 1999, Tape 192, Side B (testimony of Timothy M. Travis for OJD); *see also* Exhibit D, House Judiciary-Civil Law Committee, SB 408, June 11, 1999 (written testimony of Travis including flowchart showing disposition at permanency hearing "consistent with exception" to filing deadline for termination petition). DHS's predecessor strongly opposed that procedure. *See, e.g.*, Exhibit I, House Judiciary-Civil Law Committee, SB 408, June 16, 1999 (written testimony of Assistant Attorney General Linda Guss opposing -A12 amendment on grounds that it would require the court to consider "whether one the exceptions [under ORS 419B.498(2) (1999)] applies *before* it can establish adoption as a permanent plan for the child at issue" (emphasis added)). The legislature's decision to follow OJD's recommendation over DHS's objection supports our interpretation of ORS 419B.476(5)(d).

a compelling reason * * * why it would not be in the best interests of the child to be returned home, placed for adoption, placed with a legal guardian or placed with a fit and willing relative[.]"

ORS 419B.476(4) (2001).[13] Paragraphs (e) and (f), as they then existed, could be viewed as merely describing the required contents of the court's order, as DHS reads paragraph (d) of the current statute. *See id.* Significantly, however, in each of paragraphs (e) and (f), the determination that the court was required to include in its order *necessarily preceded* the substantive decision that the paragraph described. *See id.* Paragraph (e) reflected the established preference for reunification or adoption over the less-stable options of a legal guardianship or relative placement. *See* ORS 419B.476(4)(e) (2001). Much like paragraph (d), paragraph (e) did not expressly require the juvenile court to determine that neither other option was appropriate *before* establishing a different case plan. *See id.* But any other reading would be inconsistent with the preference reflected in the statute, in that it would allow a court to establish a less-stable placement—a guardianship or relative placement—while reunification or adoption might have remained viable outcomes. *See id.* Paragraph (f) operated somewhat differently than paragraph (e),[14] but for present purposes, it was structurally indistinguishable from paragraph (e). *Compare id., with* ORS 419B.476(4)(f) (2001).

---

[13] Before 2001, those provisions were combined, and ORS 419B.476(8) (1999) provided, as follows:

"If the court determines that the child shall be referred for establishment of legal guardianship, placed with a fit and willing relative or placed in another planned permanent living arrangement, the court shall enter written findings specifying why neither placement with parents nor adoption is appropriate. If the current placement is not expected to be permanent, the court shall specify a projected timetable for return home or for placement in another planned permanent living arrangement. If the timetable set forth by the court is not met, the State Office for Services to Children and Families shall promptly notify the court and parties. If an Indian child is involved, the placement preference under the Indian Child Welfare Act shall be followed."

[14] That provision was unique in that, rather than allowing the court to take a particular course unless there was a compelling reason not to, ORS 419B.476(4)(f) (2001) permitted the court to designate "another permanent planned living arrangement" as the permanency plan only if there was a compelling reason not to designate any other permanency plan. Like the other provisions, however, the determination that the court was required to make was that other, preferred options were not available. *See id.*

By choosing that parallel structure for paragraphs (d), (e), and (f) of ORS 419B.476(4) (2001)—with each paragraph first describing a permanency plan that the juvenile court might choose, then describing a determination that the resulting order would have to include if the court chose that plan—the legislature suggested that paragraph (d) would operate similarly to those other provisions and consistently with the earlier version of the same paragraph. *See* ORS 419B.476(4) (2001); ORS 419B.476(6) (1999).[15] Read in that manner, ORS 419B.476(4)(d) (2001)—the successor to ORS 419B.476(6) (1999)—would require, as mother suggests, that the juvenile court determine that there are no compelling reasons not to file a termination petition before changing a plan from reunification to adoption.

Based upon the foregoing analysis, we are persuaded that mother's construction is the correct one. Not only do the text, context, and history of ORS 419B.476(5)(d) and ORS 419B.498(2)(b) support that reading, the underlying purpose of those provisions supports it as well. As noted, that purpose is to ensure that the "court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child." *M.A.*, 227 Or App at 183. If, as DHS posits, the court's compelling-reasons determination relates only to the time by which DHS must file a termination petition, that determination would have no effect whatsoever on "DHS's decision to change a permanency plan." *Id.* We fail to see how that understanding of the statute would advance its recognized objective of ensuring that the decision to change a plan is the correct one. Accordingly, we reject DHS's construction.

DHS's compelling-reasons argument fares no better on its merits. We focus our discussion on the first compelling

---

[15] In support of our conclusion that the legislature did not intend to substantively alter the application of ORS 419B.476(6) (1999) by rephrasing and codifying it as ORS 419B.476(4)(d) (2001), we note the written testimony of Ramona Foley before the Senate Judiciary Committee. *See* Exhibit L, Senate Judiciary Committee, SB 419, Apr 11, 2001 (testimony of DHS Assistant Director Foley). Foley, then the administrator of DHS's State Office for Services to Children and Families, explained that those changes were mere "'housekeeping'" measures that, among other things, would serve to clarify "what the court *must* and *may* determine at hearings." *Id.* (emphasis in original).

reason identified by mother, because it is dispositive. Under ORS 419B.498(2)(b)(A), a compelling reason to determine that filing a termination petition would not be in the best interests of a child exists when the child's "parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c)."

The juvenile court made two determinations relevant to this discussion. First, in its narrative findings regarding mother's progress, the court stated:

"The circumstances and conditions that caused the child to come into care and that form the bases of jurisdiction as to Mother have not been ameliorated. *The Court finds that the child cannot be safely returned to Mother's care in a reasonable time.*"

(Emphasis added.) Second, the court checked boxes on the judgment form stating, in relevant part, the following:

"<u>None of the circumstances in ORS 419B.498(2) applies because</u> * * * there is **not** a 'compelling reason' within the meaning of that term in ORS 419B.498(2)(b) for determining that filing a petition to terminate the parent's/parents' parental rights would not be in the child's best interests[.]"

(Boldface and underscoring in original.)

Although the juvenile court explicitly determined that A could not be returned within a reasonable time—and, concomitantly, that there was no compelling reason for DHS to defer filing for termination—there is insufficient evidence in the record to support those rulings. For example, there is nothing to suggest that A's anticipated stay in substitute care would be unacceptably long given her age, the time that she had already spent in foster care, or her unique permanency needs. *See, e.g., D.A.N.*, 258 Or App at 69 (record supported implicit determination that additional delay of at least nine months, leading to total of 21 months in substitute care, was not reasonable); *D.L.H.*, 251 Or App at 792 (juvenile court heard testimony from children's psychologist regarding their needs for permanency); *see generally* ORS 419B.476(2)(a) (in making permanency decision, "the ward's health and safety [are] the paramount concerns").

Relatedly, there is no evidence of how long mother would have to remain in services before she could become a safe parent for A, or how such a delay would impair A's best interests. *See D. A. N.*, 258 Or App at 69-71. For example, there is no evidence that mother is serving a prison sentence that prevents her from obtaining needed services or interferes with her ability to bond with A. *See id.* at 69-70 (father's incarceration would lead to additional delay before *initiating* services necessary for child to return home). Nor is there evidence that mother suffers from drug or alcohol addiction, or that she has mental health issues that are too severe to alleviate within the foreseeable future. *See C. M. E.*, 278 Or App at 302, 309-11 (mother's insufficient progress in addressing her diagnoses for bipolar disorder, ADHD, and mixed-personality disorder supported juvenile court's determination that it was not reasonable to wait longer to change plan); *T. M. S.*, 273 Or App at 293-94 (mother's relapses, including recent drug use, supported court's determination that her participation in services was not a compelling reason to forgo change in plan). Finally, given mother's participation and progress to date in the programs she was required to complete, there is no evidence that her continued participation in those programs would not enable her to become at least a minimally competent parent within a reasonable time given A's particular needs.[16]

Because the record does not support the determination that mother's successful participation in services would not make it possible for A to return home within a reasonable time—given A's particular needs and circumstances and any barriers that mother might face—the court's determination under ORS 419B.498(2)(b) was erroneous. As a result, the court's corresponding decision to change A's permanency plan was likewise in error.[17]

Reversed and remanded.

---

[16] We note that the permanency judgment in this case ordered mother to continue in all of the services that the juvenile court required in its dispositional judgment.

[17] In light of our conclusion that the juvenile court erred in determining that there was no compelling reason to forgo a change of plan under ORS 419B.498(2)(b)(A), it is unnecessary to consider whether the court erred in its implicit determination that the parent-child bond in this case did not present a compelling reason under ORS 419B.498(2)(b)(B).