Ortega, J., dissenting.
*224 The majority is correct that at the time of the permanency hearing at issue, the child, C, had been in substitute care for 15 of the prior 22 months, triggering an obligation under ORS 419B.498(1) for DHS to file a petition to terminate parental rights-unless one of the circumstances identified in ORS 419B.498(2) applies. One possible such circumstance is that another plan is better suited to meet C's needs. However, the majority's construction functionally presumes that adoption-that is, the termination of parental rights of a child's birth parents-is the best plan for every child, and misplaces the burden of proving otherwise on father. That is incorrect.
To be sure, the timelines in the juvenile code aim to avoid indefinite postponement of a stable placement for a child. However, ORS 419B.498(2) also requires the juvenile court to engage, at the permanency stage, in a meaningful inquiry as to whether a plan other than adoption is "better suited to meet the health and safety needs of the child." Before the juvenile court may approve a petition by DHS to change the plan to adoption, DHS must establish that there does not exist such a compelling reason to forgo implementing a plan of adoption. Dept. of Human Services v. S. J. M. , 283 Or. App. 367, 392-94, 388 P.3d 417, rev. allowed , 361 Or. 350, 393 P.3d 1175 (2017). " ORS 419B.476(5) and ORS 419B.498(2) call for a 'child-centered' determination based on a current evaluation of the child's circumstances." Dept. of Human Services v. S. S. , 283 Or. App. 136, 142, 388 P.3d 1178 (2016). The juvenile court must "carefully evaluate DHS's decision to change a permanency plan for a child * * * to ensure that the decision is one that is most likely to lead to a positive outcome for the child." State ex rel. DHS v. M. A. , 227 Or. App. 172, 183, 205 P.3d 36 (2009) (emphasis added).
Here, DHS failed to meet that burden, merely raising "concerns" about the particular guardian whom father had proposed, and the court briefly inquired into the nature of DHS's concerns. Although the court went on to determine that compelling reasons to forgo implementing a plan of adoption were not present, the record does not support that determination. The court did not engage in the *225 necessary meaningful inquiry to support its determination, and DHS did not present legally sufficient evidence-under circumstances where C is strongly attached to father, who is temporarily unable to function as a custodial resource, and to other family members-that another plan such as a guardianship would not be better suited to meet C's health and safety needs than terminating father's parental rights. Accordingly, I dissent.
I begin with the statute. Under ORS 419B.498(2)(b), DHS is required to initiate a petition to terminate parental rights under these circumstances unless "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child * * *." Such compelling reasons "include, *595 but are not limited to" that "[a]nother permanent plan is better suited to meet the health and safety needs of the child * * *." ORS 419B.498(2)(b)(B). The juvenile court must evaluate the possible existence of compelling reasons not to pursue an adoption before changing the plan and must be able to find affirmatively from the record before it that none of the identified compelling reasons to forgo a plan change are present. S. J. M. , 283 Or. App. at 392, 388 P.3d 417 ; see also Dept. of Human Services v. J. M. T. M. , 290 Or. App. 635, 638, 415 P.3d 1154 (2018) ("One of the 'compelling reasons' that the plan-change proponent must prove is not present is that there is a better plan for the child, given that child's needs." (Emphasis in original.) ). "That necessarily means that the record must contain sufficient evidence to permit a rational inference that none of the other permanency plans contemplated by the permanency statutes would better meet the particular child's needs under the circumstances." Id. In order to meet that burden, DHS must present evidence that it inquired into whether and how other permanency plans would meet the child's needs, and that such an inquiry revealed that, under the circumstances, no plan other than adoption would better serve the child's needs.
The majority does not dispute that C's attachment to father is well-documented in the file. C had been placed with his father for several months after father's completion of a previous period of incarceration, and there is no *226 dispute that the placement went well; father worked with service providers to address C's needs, and C's behavior significantly improved. At the time of the permanency hearing, father was again incarcerated, with a planned release in 2022-but he had communicated with C by phone, and his attorney expressed that C continued to wish to live with father. In the meantime, C was in a stable placement with his maternal cousin KG.
In my view, such circumstances present a genuine question about whether termination of father's parental rights, thereby severing his legal relationship with C, is the plan best suited to meet C's health and safety needs. Contrary to the majority's suggestion 294 Or. App. at 217-18, no further documentation is required to put the issue before the juvenile court. The burden of demonstrating that another plan is not better suited to meet C's health and safety needs rests with DHS as the proponent of changing the plan to adoption; it does not rest with father. Moreover, a child's attachment to a parent is the very definition of a compelling reason why terminating his legal relationship to that parent may not be the best means of meeting the child's health and safety needs; no further documentation of the issue is necessary to trigger a meaningful examination of whether C's attachment to father and other relatives does indeed constitute a reason not to pursue an adoption.
DHS failed to meet that burden in this case. It simply indicated at the permanency hearing that father would be incarcerated until 2022 and that adoption "is the most permanent, most stable plan that this child can have." Compared to guardianship, adoption is always more permanent, so that statement has no evidentiary significance; it does not constitute evidence about whether another plan that does not involve terminating the parental rights of the father to whom C is attached would not be better suited to meet his needs. DHS did nothing to indicate that it had meaningfully explored any options other than adoption and termination of father's parental rights.
It was father who introduced at the hearing the prospect of an alternative plan of guardianship. Indeed, he proposed a specific and willing guardian to whom C was *227 attached-a cousin who was then functioning as his foster parent. DHS responded that it had a "preference" for adoption because of "concerns" about the foster parent's resistance to DHS's rule that she not allow C's maternal grandmother to have unsupervised contact with him. The court then took unsworn testimony from the foster parent, who spoke passionately about the concerns she had expressed to DHS about C being restricted from contact with the grandmother, and from the grandmother herself.
It is clear from the slender record of the permanency hearing in this case that DHS and the foster parent disagreed about the *596 reasonableness of DHS's restrictions on contact with C's maternal grandmother. The juvenile court did not attempt to resolve that dispute, and resolution of this case does not require us to resolve it either. What DHS did not do was establish any basis on this record for rejecting the possibility that another plan such as a guardianship might well be best suited to meet C's health and safety needs. It merely raised "concerns" about whether it could certify KG to serve as a guardian-concerns that were not resolved by the juvenile court.[1] DHS did not establish that it had searched for other possible guardians or that placement with KG or another guardian would not serve C's health and safety needs better than an adoption would. The record of the permanency hearing provided the juvenile court with no basis for weighing whether the possible distress that C would experience if his legal ties to his father and other family members were severed was preferable to preserving *228 those ties even though father would not be in a position to serve as a custodial parent for several years.
The Supreme Court has recognized that the fact of incarceration alone does not necessarily establish a level of unfitness that justifies termination of parental rights, where children are attached to an incarcerated parent and where they experience distress at the prospect of termination of his parental rights. See State ex rel. SOSCF v. Stillman , 333 Or. 135, 150-53, 36 P.3d 490 (2001). Indeed, were the fact of a long separation enough to justify termination of parental rights, long separations due to military service would similarly justify severing the legal relationships between parents and their children. Under the circumstances here, DHS had an obligation to do more than simply posit adoption as "the most permanent, most stable plan"; it had to show that there was not another plan better suited to meeting C's health and safety needs. That is not simply how father "would prefer to frame the issue" 294 Or. App. at 215; it is what the statute demands. The juvenile court had no basis for concluding that no such better plan existed in this case. Consequently, I dissent.
Egan, C. J., and Lagesen, James, and Aoyagi, JJ., join in this dissent.

It is notable that, despite DHS's expressed hesitation about KG serving as a guardian (permanently or until father is out of prison), DHS nonetheless identified her as a potential adoptive resource. Moreover, for purposes of C's concurrent plan, the juvenile court expressly found that C's existing placement with KG was in his "best interests" both generally and in specific ways. In these circumstances, it would be inappropriate to read into the court's silence any implicit finding or conclusion about KG's propriety as a guardian. Finally, the legislature has expressed a preference for placement with relatives and maintenance of family ties in lieu of termination of parental rights. ORS 419B.498(2)(a) is a specific exception to the requirement that DHS pursue adoption and termination of parental rights once a child has been in care for 15 of the preceding 22 months, which exception applies when the child is "being cared for by a relative and that placement is intended to be permanent."ORS 419B.498(2)(a). Although no one has argued that the exception applies here, it is indicative of the legislature's preference not to terminate parental rights when a child is in a stable placement with a family member.