Argued and submitted February 6, affirmed April 26, 2017

In the Matter of K. E. R.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. I. R.
and L. A. S.,
*Appellants.*

Lane County Circuit Court
15JU03845; A163181

395 P3d 970

G. Aron Perez-Selsky filed the brief for appellant D. I. R.

Valerie Colas, Deputy Public Defender, argued the cause for appellant L. A. S. With her on the brief was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief were

Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

**DeVORE, J.**

Mother and father appeal a juvenile court judgment changing the permanency plan for their daughter, K, from reunification with parents to adoption. First, the court determined that, although the Department of Human Services (DHS) had made reasonable efforts to reunify K with parents, mother and father had not made sufficient progress for K to be safely returned to parents' care at the time of the permanency hearing and that further efforts would not make it possible for K to safely return home in a reasonable time. ORS 419B.476(2)(a), (4)(c), (5)(c). Second, the court determined that there were no compelling reasons for DHS to delay filing a petition to terminate parents' parental rights and proceeding with adoption. ORS 419B.498(2)(b). Mother and father challenge the court's determinations on the grounds that, given the progress they have made and will make through participation in services, K can safely return home in a reasonable time. We conclude that because there is sufficient evidence in the record to support the determinations of the juvenile court, the court did not err in changing the permanency plan to adoption.

## I.  BACKGROUND

In reviewing those determinations, we view the evidence, as supplemented by permissible derivative inferences, in the light most favorable to the juvenile court's disposition, and we assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).[1]

### A.  *DHS History*

Mother and father each have extensive involvement with child welfare services. Mother, with different partners, has four other minor children in Texas who were removed from her care due to substance abuse, neglect, and domestic violence. Father, with a different partner, has three other

---

[1] Parents have not asked us to exercise our discretion to review this case *de novo*, and this is not an exceptional case warranting *de novo* review. *See* ORS 19.415(3)(b) (court has discretion to conduct *de novo* review in equitable cases); ORAP 5.40(8)(c) (*de novo* review appropriate only in exceptional cases).

children who were removed from his care because of substance abuse, neglect, and domestic violence.

By the age of five, K had already been removed twice by DHS from parents' care, and a third removal would follow. She was removed first due to parents' substance abuse, neglect, domestic violence, and mental health issues. Although parents initially participated in services, and were separated from each other, mother continued to abuse substances after the family reunited. K was removed next after a recliner in mother's home caught fire due to a cigarette. Mother had been so unresponsive from her medications or other substances during the fire that neighbors had to drag her and K out. Following her removal to substitute care, K was again returned to parents' care.

B.   *Jurisdiction Over K*

In June 2015, DHS received a call about domestic violence between K's parents. Mother reported to a neighbor that father had used methamphetamine and assaulted her and that she was afraid to return home. Father was arrested for fourth-degree assault, menacing, harassment, driving under the influence of intoxicants, and possession of methamphetamine. Arriving unannounced, DHS workers met with mother at home and smelled marijuana and alcohol. Mother had rapid and slurred speech and an inability to formulate complex ideas, leading the workers to suspect that she was under the influence of intoxicants. Mother told the DHS workers that she was drinking a beer or two every few days, smoking marijuana, and not taking her prescribed mental health medications. Mother was no longer participating in services for her mental health and substance abuse, as recommended in her previous DHS case. Mother described father as "very controlling in their relationship." DHS removed K, placing her in protective custody.

In its Protective Custody Report, DHS noted recent psychological evaluations in which Dr. Basham diagnosed both parents with various disorders. Mother's diagnosis included "PTSD; alcohol use disorder, moderate in partial remission; cannabis use disorder, moderate in early remission; bipolar I disorder; [and] attention deficit hyperactivity

disorder. Dependent personality traits, rule out personality disorder." Dr. Basham diagnosed father with "rule out explosive disorder, rule out substance abuse/alcohol disorder, narcissistic and antisocial personality traits."

DHS petitioned the juvenile court to take jurisdiction over K. After a hearing in August 2015, the juvenile court took jurisdiction on the following bases, as pertinent to this appeal:

> "The father has engaged in domestic violence against the mother which poses a safety risk to the child.

> "The father's substance abuse, if left untreated, interferes with his ability to safely parent.

> "The mother's substance abuse interferes with her ability to safely parent, if left untreated.

> "The mother's mental health condition, if left untreated, interferes with her ability to safely parent.

> "The mother needs additional domestic violence treatment in order to safely parent her child."

The juvenile court continued K's placement in foster care, where she had been placed since the June 2015 incident. The court ordered reunification with parents as K's primary case plan. And, the court also ordered that mother and father, among other things, complete drug and alcohol evaluations, psychological evaluations, and domestic violence and batterer's counseling, as well as mental health treatment.

## C. Permanency Hearing

In August 2016, the juvenile court held a permanency hearing. DHS requested a 90-day extension of the reunification plan to continue to work with parents. Mother supported the request. Father sought a 120-day extension on the ground that more time would be helpful. Disagreeing, the child, through counsel, and the Court Appointed Special Advocate (CASA) asked the court to change K's plan from reunification to adoption.

At the time of the permanency hearing, the record showed that parents had continued to attend all of their court-ordered services, and mother had achieved a year of sobriety. Nonetheless, DHS expressed concerns that "[t]hese

parents have had [K] removed 3 times and while they do very well in services, once DHS steps away, they return to their old patterns of substance abuse and domestic violence." According to DHS, this meant that K should not be returned home at that time because DHS needed to continue monitoring mother and father for "demonstrated change."

As for father, a psychological evaluation in March 2016 expressed concerns that his domestic violence treatment program incorrectly identified his behavior as situational couples violence rather than "coercive controlling behavior." Dr. Wilson specifically recommended:

"To this end, [father] needs to continue to engage in the services he is currently attending and follow all recommendations and requirements of treatment. It needs to be confirmed that his domestic violence treatment program has accurately assessed his behavior as coercive controlling behavior and not situational couples violence. * * * Not only is [father] not focusing on his beliefs, but his current program is also erroneously attributing his anger to neuroscience that isn't accurate * * * Progress for [father] should be measured by his ability to obtain observable, measurable, and achievable skills. *Observable behavioral change should occur within six to nine months, with sustainable and reliable change occurring within nine months to a year.*"

(Emphasis added.) A domestic violence assessment in May 2016 recommended that father complete a 48-group-session domestic violence intervention program with a county-approved batterer's intervention program. At the hearing, father's counsel reported that father had attended at least 15 sessions of what was a 36- to 52-week program. A letter in August 2016 from a parent trainer, who had observed parents' interactions with K, expressed dissatisfaction that father became frustrated with her, grabbed her arm, and guided her in an intimidating manner. According to the parent trainer, "Based on his history of abuse this writer is quite concerned regarding his ability to parent safely."

As for mother, a psychological evaluation discussed events following her prior DHS case. According to Dr. Basham, mother and father both relapsed in mid-June 2015, after nearly two years clean and sober. Dr. Basham wrote, "Once the relapse began, it only took three weeks for

their alcohol and drug use to get bad. She relapsed to alcohol and marijuana." The evaluation observed:

> "A broader overview of [mother's] involvement with Oregon DHS and the equivalent agency in Texas shows longstanding problems that are suggestive of a personality disorder. Her substance abuse and mood disorder have waxed and waned over the years, but both of them seem to have been largely controlled following her previous evaluation, until this past summer. However, she was still vulnerable to influence from her partner and immediately relapsed when he brought beer into the house (according to her)."

The evaluation, in part, concluded:

> "Due to the nature of [mother's] personality disorder, her functioning as a parent will be strongly influenced by the status of her relationship. She has little ability to protect herself or her child against risks posed by a partner, and also remains vulnerable to being involved with dangerous individuals, who may be attracted to her under-assertiveness and dependent personality. She is clearly capable of making gains with regards to drug and alcohol abuse but that has proven insufficient to prevent recurrence of problems in caring for her children that have been seen over a period of years. Her stated intention is to eventually reconcile with her daughter's father, but he would have to show significant gains in his own treatment for such a reconciliation to be successful, without any further domestic violence or relapses for either."

The parent trainer, who had expressed concerns about father's ability to safely parent, was also concerned about the relationship between mother and father. The letter stated "it is recommended that [parents] do not continue their relationship as I predict that at the very least [mother] may be controlled to the point that it becomes emotionally abusive and that she may begin drinking in order to cope with her feelings of inadequacy. Additionally this will not be in the best interest of [K]."

As for K, the record showed that she had been out of the family home for 13 of the last 22 months. K had two regular foster home placements before DHS moved her to a relative foster home with her paternal grandparents. She

remained with her grandparents for nearly 11 months, but her grandparents, due to circumstances in their own lives, were no longer able to care for her. K's grandparents had provided her with a loving, structured environment, and she was initially sad to leave them. DHS then placed K with a previous foster family, whom she was ultimately glad to return to as there were other children living there.

DHS presented evidence that K has excelled in foster care. Her foster mother has continued to work with K on her boundary issues. K's report card has improved and she has received complimentary remarks from elementary school staff. Before foster care, K was lacking in education, and had only briefly attended kindergarten. K's current foster home has expanded her activities, sent her to several camps and religious school, and taken her camping. K's CASA noted in a report that "[K] is happy to be living at this foster home, where she has previously lived, and where she has other children to play with. She has informed me that she would like to live there forever and just have visits with her parents."

The juvenile court entered a permanency judgment changing K's permanency plan from reunification with her parents to adoption. The court determined that while DHS had made reasonable efforts to reunify parents with K, parents had made insufficient progress for K to be safely returned to her parents' care at the time of the hearing. The court next determined that further efforts would not make it possible for K to safely return home in a reasonable time.

In explanation, the judgment reflected specific findings as to mother's progress, including that she seeks to reunite with father despite his struggle to apply what he has learned from services; that her year of sobriety coincided with the year of the no contact order with father; and that she has been prone to relapse of substance abuse once DHS involvement has ended.

The judgment reflected specific findings as to father's progress, including that observable change should occur within six to nine months and reliable change within nine months to a year; the importance of properly identifying

father's behavior as coercive controlling behavior; that concerns about father's abusive behavior remain; that father is prone to relapse of substance abuse; and that K is fearful of return.

The juvenile court made further findings, primarily focusing on what K had experienced:

> "This case involves the third removal of this child from parents. She is seven years old. She has spent a significant portion of her young life in foster care. The most recent case closed in Spring 2014 when the child was placed with both parents. After closure of the last case, the parents resumed use of alcohol and marijuana. The child has reported about her parents fighting all the time and that she is afraid her father will kill her mother. This seven year old child also did not want the caseworker to see her father in jail because the child was concerned her father would hurt the caseworker. The thought of returning to her parents' care caused the child to cry during a recent visit with her CASA. When she came into care she was behind academically and socially. She did not have any 'stranger danger' and foster parent has been working with her on boundaries. Structure and support have allowed the child to thrive in her out of home placement. This child's experiences, including her three removals by the time she was six years old, are significant and traumatic."

Finally, the court determined that there were no compelling reasons under ORS 419B.498(2) to defer filing a petition to terminate parents' rights and proceeding to adoption.

## II.  ANALYSIS

The thrust of mother's and father's arguments is that they have made sufficient progress such that K could safely return home in a reasonable time. Although mother and father frame their arguments in terms of "sufficient progress," we understand them to argue that, given the progress they have made and will make through services, K can return in a reasonable time, pursuant to ORS 419B.476 (4)(c), (5)(c), and ORS 419B.498(2)(b)(A).[2] Because those

---

[2] Mother sometimes references "sufficient progress," a determination the court is required to make under ORS 419B.476(2)(a). However, we understand mother to focus on whether K could safely return home in a "reasonable time," pursuant to ORS 419B.476(4)(c), (5)(c) and ORS 419B.498(2)(b)(A). Father argues

provisions turn on whether the record was sufficient to support a determination that K could not safely return home in a *reasonable time*, we discuss them together.

## A. *Statutory Framework*

We begin with a review of the statutes governing permanency decisions. Once a child under juvenile court jurisdiction is in substitute care, the court must periodically hold permanency hearings to determine the permanency plan for the child. ORS 419B.470.[3] At the permanency hearing, the court is required to make certain determinations, under ORS 419B.476(2), including:

> "(a)  If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

As we have explained, the court may change a child's plan from reunification to adoption if the record shows that "(1) DHS made reasonable efforts to make it possible for the child to return home safely *and* (2) the parent has not made sufficient progress for that to occur." *Dept. of Human Services v. R. S.*, 270 Or App 522, 527, 348 P3d 1164 (2015) (emphasis in original; internal quotation marks omitted). However, "[i]f the court determines that further efforts *will make it possible for the ward to safely return home within a reasonable time*, [the court may] order that the parents participate in specific services for a specific period of time and make specific progress within that period of time." ORS 419B.476(4)(c) (emphasis added).

---

that he had made sufficient progress at the time of the hearing, but we reject that argument without written discussion.

 [3]  ORS 419B.470 provides, in part:

> "(2)  In all other cases when a child or ward is in substitute care, the court shall conduct a permanency hearing no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is the earlier."

The court then must enter an order within 20 days after the permanency hearing that includes the court's specific determinations regarding DHS's reasonable efforts and parents' sufficient progress, any other determinations, and the court's determination of the permanency plan, *i.e.*, that the child will be returned to parents or placed for adoption. ORS 419B.476(5). The order must also include, "[i]f the court determines that the permanency plan for the ward should be adoption, the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable." ORS 419B.476(5)(d).

That cross-referenced statute, ORS 419B.498(2)(b), provides exceptions to DHS's deadline for filing a petition to terminate parental rights. One exception exists when

"[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

"(A)  The parent is successfully participating in services that *will make it possible for the child or ward to safely return home within a reasonable time* as provided in ORS 419B.476(5)(c)[.]"

ORS 419B.498(2)(b) (emphasis added). That issue, "reasonable time," is the central issue in this case.

B.  *K's Ability to Safely Return Home in a Reasonable Time*

Accordingly, we address whether the court erred in determining that further efforts would not enable K to safely return home in a reasonable time under ORS 419B.476(4)(c) and (5)(c) and in determining that there were no compelling reasons—such as that parents were successfully participating in services to enable K to safely return home in a reasonable time—to defer filing a petition to terminate parental rights and proceeding with adoption, pursuant to ORS 419B.498(2)(b)(A).[4] Both mother and father have argued

---

[4] We do not see any meaningful difference in the way that we have addressed whether a child could safely return home in a "reasonable time" under ORS 419B.476(4)(c) and ORS 419.498(2)(b)(A). As long as the juvenile court has made a determination that the child could or could not safely return home in a reasonable time, we have reviewed whether there was sufficient evidence in the record to support that determination. *Dept. of Human Services v. S. J. M.*, 283

that their completion of services and willingness to participate in additional services demonstrates that K could safely return home in a reasonable time. Our task is to determine whether the evidence in the record is sufficient to support the court's findings that K could not be safely returned to mother's or father's care in a reasonable time. To make that determination, we consider K's "particular needs and circumstances and any barriers that [parents] might face." *Dept. of Human Services v. S. J. M.*, 283 Or App 367, 394, 388 P3d 417, *rev allowed*, 361 Or 350 (2017); *see also* ORS 419A.004(23) (defining "reasonable time" as measured by "a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments").

In *S. J. M.*, we discussed the type of evidence that we have considered in deciding whether or not there was sufficient evidence in the record to support the juvenile court's determination regarding a child's ability to safely return home in a reasonable time. 283 Or App at 393-94. That evidence included: (1) whether the child's placement in substitute care "would be unacceptably long given her age"; (2) the amount of time the child had already spent in foster care; (3) the child's "unique permanency needs"; (4) how long the parent would have to remain in services before the child could safely return home, and how such a delay would impair the child's best interests; (5) whether the parent "suffers from drug or alcohol addiction, or that [the parent] has mental health issues that are too severe to alleviate within the foreseeable future"; and (6) the parent's participation and progress in services at the time of the permanency hearing. *Id.* Because the record in *S. J. M.* lacked most of this evidence, we concluded that that "record [did] not support the determination that mother's successful participation in services would not make it possible for [the child] to return home within a reasonable time—given [the child's] particular needs and circumstances and any barriers that mother might face[.]" *Id.* at 394.

---

Or App 367, 393-94, 388 P3d 417, *rev allowed*, 361 Or 350 (2017) (involving ORS 419B.498(2)(b)(A)); *Dept. of Human Services v. L. A. S.*, 259 Or App 125, 131, 312 P3d 613 (2013) (involving ORS 419B.476(4)(c)); *Dept. of Human Services v. D. L. H.*, 251 Or App 787, 806, 284 P3d 1233, *adh'd to as modified on recons*, 253 Or App 600, 292 P3d 565 (2012), *rev den*, 353 Or 445 (2013) (same).

In this case, the record contains much of the evidence that was absent from the record in *S. J. M.* By the time K was almost six years old, she had been removed from her parents' care three times. As to her unique needs, she had informed her CASA that she wished to live at her foster home forever and just have visits with her parents. K, who had been behind academically and socially, has excelled since her foster home placements. K also expressed fear to a caseworker that her father would kill her mother, and that her father would hurt the caseworker. There is further evidence that both mother and father have suffered from drug and alcohol addiction, that K has witnessed their use of substances, and that despite their participation in and completion of services they have been prone to relapse after DHS has discontinued services. Moreover, father's psychological evaluation, made five months before the hearing, indicated that father would not likely experience "observable behavioral change" for six to nine months and "sustainable and reliable change" for nine months to a year. Mother's psychological evaluation indicated that her substance abuse and mood disorder have fluctuated over the years and are strongly influenced by father. The record reflects that mother and father seek to resume their relationship.

There is sufficient evidence in the record from which the juvenile court could find, based on K's particular needs for permanency and stability, mother's and father's history of relapse with substances and domestic violence, and a history of DHS removing children from their care, that K could not safely return home in a reasonable time. As the juvenile court correctly noted, by the time of this judgment, "[t]his child's experiences, including her three removals by the time she was [almost] six years old, are significant and traumatic." K has already spent a considerable part of her young life in foster care and has experienced a lack of permanency. The record indicates that K would not find such permanency with mother and father in a reasonable time—either because both parents need to engage in services for a considerable amount of time before K can safely return home or, even if K could return sooner, there is a high risk that she will be removed again due to parents' history of relapse and discontinuing services.

The juvenile court did not err in its "reasonable time" determinations.[5] For that reason, we conclude that, based on sufficient evidence in the record, the juvenile court did not err in changing the permanency plan from reunification to adoption.

Affirmed.

---

[5] Mother asserts that the court erred because the proponents of the change in plan—the child's attorney and CASA—presented no evidence at the hearing that it was unreasonable for K to remain in foster care for an additional three months based on her developmental and attachment needs. Regardless of which party bears the burden of coming forward, on this record there is sufficient evidence to support the court's determination that K could not safely return home in a reasonable time.