Argued and submitted January 15, affirmed May 11, 2016

In the Matter of M. J. R. E.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

M. J. R. E.
and Clatsop CASA Program, Inc.,
*Respondents,*

*v.*
C. M. E.,
*Appellant.*

Clatsop County Circuit Court
14JU01079; A160309

374 P3d 969

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Shannon

Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Ginger Fitch argued the cause and filed the brief for respondent M. J. R. E.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent Department of Human Services.

Clatsop CASA Program, Inc., filed the brief *pro se.*

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## GARRETT, J.

Mother appeals a judgment of the juvenile court changing the permanency plan for her child, M, from reunification to adoption.[1] The juvenile court concluded that the Department of Human Services (DHS) had made reasonable efforts to reunify M with mother but that mother had not made sufficient progress to make it possible for M to safely return home. ORS 419B.476(2)(a). On appeal, mother challenges the juvenile court's change of plan, arguing that (1) mother had made sufficient progress to allow M to safely return home, ORS 419B.476(2)(a), and, consequently, that a compelling reason existed for the court to decline to change the permanency plan, ORS 419B.498(2)(b)(A); (2) the bond between mother and M is a compelling reason to determine that a plan other than adoption would be in M's best interests, ORS 419B.498(2)(b)(B); and (3) the failure by DHS to provide services to mother earlier in the dependency case is a reason to forgo implementing a permanency plan of adoption, ORS 419B.498(2)(c). DHS agrees with mother.[2] We conclude that the juvenile court did not err by changing the permanency plan. Accordingly, we affirm.

No party requests that we engage in *de novo* review, nor do we perceive any reason to exercise our discretion to do so. *See* ORS 19.415(3)(b) (providing for discretionary *de novo* review in equitable actions); ORAP 5.40(8)(c) (*de novo* review is appropriate only in exceptional cases). We thus "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). That is, our review

"[d]oes not allow us to substitute our assessment of the persuasiveness of the evidence for the juvenile court's, nor does it allow us to revisit the juvenile court's resolution of

---

[1] Father's whereabouts at the time of the proceeding were unknown, and, consequently, father is not a party to this appeal.

[2] DHS did not appeal from the permanency judgment. On appeal, DHS submitted a brief in its capacity as a named respondent on mother's appeal and as an interested state agency, pursuant to ORAP 8.15(9). M and the court appointed special advocate (CASA) defend the judgment below.

factual disputes or its choice among reasonable inferences.
Rather, * * * our function is limited to determining whether
the evidence was sufficient to permit the challenged
determination."

*Id.* at 640.

We begin with a brief history of DHS's involvement
with mother and M. DHS removed M from mother's care
immediately after his birth in May 2007 and placed him in
nonrelative foster care. At that time, mother was 18 years
old and had substantial mental-health and substance-abuse
problems. Thereafter, mother successfully engaged in ser-
vices and established a support network—which included
mother's relatives as well as M's foster parents—to moni-
tor her parenting on an ongoing basis. M was returned to
mother's care, and, in 2010, the wardship of M was termi-
nated. Subsequently, the foster parents maintained a close
relationship with M.

During the next few years, DHS received several
reports concerning mother's parenting, although none
resulted in formal DHS intervention. By 2013, however,
DHS was notified that mother had stopped taking her
mental-health medication, that her behavior was erratic,
and that M's school attendance was irregular. Despite
numerous attempts by DHS to check on the family, mother
denied access to providers and other members of her support
network.

In April 2014, having obtained a warrant for
mother's arrest based on her failure to appear on a crim-
inal mischief charge, police entered mother's home; they
observed unsanitary and unsafe living conditions, including
rotting food and garbage on the floor, as well as numerous
safety hazards. Mother was forcibly removed from the bath-
room, where she had locked herself and M. After mother was
taken into custody, M's grandmother and her husband told
police that mother had been off her medication for approxi-
mately one year and expressed their view that M should be
placed in foster care with the foster parents.

On DHS's petition, the juvenile court took jurisdic-
tion over M in May 2014 on the grounds that (1) "[m]other's

mental health problems interfere with her ability to provide minimally adequate care of the child, placing the child at risk of harm" and (2) "[d]espite having participated in services designed to improve mother's parenting skills, she is unable to safely parent the child, placing the child at risk of harm." M was again placed in foster care with the foster parents.

For periods while she was in custody, mother refused to speak, bathe, or eat. After being diagnosed with, among other things, bipolar disorder, attention deficit hyperactivity disorder (ADHD), and post-traumatic stress disorder (PTSD), mother was transferred to the psychiatric unit at Oregon Health Sciences University (OHSU). After several months there, she was released to a residential treatment facility, Telecare, where a psychiatric assessment revealed a history of substance abuse, multiple traumas and self-harming behaviors, and frequent failure to take prescribed psychiatric medications. While at Telecare, mother struggled to maintain appropriate boundaries with staff and complained about lethargy due to her medications. Following her release from Telecare in November 2014, mother expressed her desire to engage in mental-health services and parenting classes, and she also asked to visit M.

At a December 2014 permanency hearing, M's attorney and the court appointed special advocate (CASA) requested that the permanency plan be changed from reunification to adoption. The juvenile court determined that DHS had failed to make reasonable efforts to provide mother with services during the first seven months of the case—that is, the periods when mother was in jail, at OHSU, and at Telecare. Thus, the court declined to change the plan and scheduled the next permanency hearing for November 2015. At the request of M's attorney, however, the juvenile court held an early permanency hearing on August 20, 2015.

At the August 20 hearing, the juvenile court was presented with the following evidence. In December 2014, mother received a psychological evaluation by Dr. Deitch, who had evaluated mother on two earlier occasions, in 2007 and 2008, to assess her capacity as a parenting resource for

M.[3] The 2014 evaluation, submitted to the court as an exhibit, listed Deitch's diagnoses of mother as including, among other things, bipolar disorder, ADHD, and mixed-personality disorder. Deitch observed that, as a result of mother's severe mental-health issues, mother's ability to provide minimally adequate care for M would depend on the consistency of her medication management, the maintenance of a strong support network, and consistency in attending therapy sessions. Deitch also observed that, "[i]t appears as if [M] is used to taking care of himself (and even * * * mother)," and that it would be important for mother to develop a clear parental role. Deitch then noted "important concerns about [mother's] long-term ability to be a residential placement resource for [M]." Specifically, Deitch explained that

"[mother's] level of maturity continues to be low, her insights into her functioning are impaired, she is greatly minimizing relevant mental health issues, and she appears to be out of touch with [M's] emotional needs. The described 'cyclic nature' of her mental health functioning is likely to continue into the future, given the chronicity of her Bipolar Disorder in particular. Accordingly, [mother's] long-term prognosis for being a consistently safe, stable and protective residential parenting resource for [M] is considered to be highly guarded, if not poor."

The juvenile court also received evidence from mother's treatment providers. In March 2015, mother began regularly attending counseling sessions and completed a parent-empowerment program at Clatsop Behavioral Healthcare (CBH). A brief account of mother's progress at CBH was presented to the juvenile court in the form of a DHS report. According to that report, mother's providers indicated that, although, by August 2015, mother was "opening up and showing tremendous counseling growth," she struggled with concepts from the parent-empowerment program, despite having previously participated in the program. Through CBH, mother consistently participated in medication management to help control her symptoms, including her lethargy. However, the report indicated that,

---

[3] The record indicates that an additional evaluation was completed in August 2015; that evaluation, however, was not before the juvenile court and is not a part of the record on appeal.

mother "continues to claim that she feels tired often," and requests that her medications be adjusted. To ensure ongoing management of her bipolar disorder, mother began receiving her medication by monthly injection.

Reports from mother's provider at Families Together indicated that, beginning in April 2015, mother participated in hands-on parenting training consisting of weekly home visits designed to educate mother about M's needs, strengthen a "parent-child" relationship, and provide general parenting instruction and support. The provider noted that mother exhibited limited insight into the conditions that led to formal DHS involvement, her hospitalization, and the removal of M. The reports further indicated that, although mother's interactions with M were mostly appropriate, mother continually struggled to maintain a parental role with respect to M. In a closing summary dated August 3, 2015, the provider opined that, although mother had a strong bond with M and had made progress in achieving some of her parenting goals, mother's role in M's life was that of "a friend, a peer, and a play partner" rather than a parent. The summary indicated that mother appeared to understand M's needs but lacked knowledge as to how to meet them. The report concluded with the provider's concern that mother would be unable to "set and enforce age-appropriate boundaries and expectations" for M as he continued to develop.

In a report dated August 10, 2015, the CASA indicated that, despite mother's participation in numerous services and her obvious love for her son, mother continued to display the same characteristics identified by Deitch in December 2014. Specifically, the CASA explained that mother continued to have "shallow insight into her mental health," as evidenced by mother's responses to questions regarding the circumstances that prompted formal DHS intervention.[4] Moreover, the report echoed providers' concerns that mother

---

[4] Specifically, the CASA report noted that, "[a]s recently as last week [mother] described the circumstances that brought [M] into care as the result of her being 'falsely accused' by *** police of committing graffiti in a park, after which [mother] says she fell into depression and was extremely tired." When asked about the likely effects of her depression on M, mother responded only that he "probably missed having someone to talk to when she was sleeping."

had failed to develop an adequate parental role in relation to M and continued to exhibit limited insight into M's needs. For example, when asked by the CASA about her participation in the Families Together program, mother replied that "she did not learn anything" and that she knew more about parenting based on her own experience and the parent-empowerment program in which she participated at CBH. However, when questioned further about her participation in that program, mother was unable to articulate what she had learned. The CASA report concluded that, given M's needs for immediate stability and permanency,[5] and based on the CASA's belief that there remained a "current threat of serious loss or injury to [M]" if he was returned to mother's care, the permanency plan should be changed to adoption.

The DHS report prepared for the August 2015 permanency hearing acknowledged mother's continuing struggles with maintaining a parental role, as well as her limited insights into the issues and behaviors that led to formal DHS involvement. Nevertheless, the report concluded that mother had met DHS's conditions for M's return, and that DHS would continue to move towards reunification. At the permanency hearing, DHS caseworker Tannler testified that, despite ongoing concerns about mother's ability to take care of herself and M on a daily basis, mother had made sufficient progress to enable DHS to implement a comprehensive safety plan, which would allow mother to parent M independently in her home with the help of a support network comprised of family members and service providers. In large part, that safety plan consisted of having people "check in" on mother at least twice a day to ensure that she had performed basic parenting functions, such as feeding M, getting him ready for school, and putting him to bed.

---

[5] The CASA report referred to a psychological evaluation of M conducted by Dr. Munoz in July 2014. That evaluation noted that M was "at an age where he begins to make sense of his world and safety" and that M's ability to do so was contingent upon having a secure caregiver. Moreover, Munoz concluded that M "clearly has that with his foster family whereas a significant portion of his time in the care of his mother was impacted by her mental health issues that impaired her ability to provide a safe and stable environment." The report also suggested that M exhibited "possible cognitive impairments" that require a caregiver who is capable of advocating for M's needs at school and providing M with a "stable and enriched environment."

Tannler acknowledged that the proposed safety plan was "similar" to the plan DHS had put in place before the termination of the first wardship, and that that plan had been ineffective. Tannler testified that the new plan was different in that grandmother was now listed on mother's lease, had a key to mother's apartment, and was appointed as mother's legal guardian. According to Tannler, those differences alleviated some of DHS's concerns that mother would again isolate herself from family members and service providers. Tannler estimated that the safety plan would enable M to be reunited with mother "no later than October" 2015.

M, who was then eight years old, made a statement to the court expressing his desire to live with the foster parents until he turned 18 years old.

At the conclusion of the permanency hearing, the court changed the plan to adoption, finding:

> "This child has been in substitute care at least 15 or 16 of the last 22 months, and a significant portion of time before that. Not * * * an irrelevant factor. So he's been in care, removed from care, put back in care, removed—and another removal would be catastrophic, as we all know regarding children.

> "But in any case, a significant portion of his life, he's been in substitute care. He needs permanency. He's needed it for some time. Every child needs permanency.

> "This particular child has needed it for a considerable period of time.

> "* * * * *

> "The Court cannot find that the plan that DHS articulates means that this child can be safely returned to his mother within a reasonable time. Reasonable time * * * is a reasonable time for [M] that meets his needs.

> "I—Court cannot find that mother has, in totality of everything I've heard and read, made sufficient progress to effectuate that plan.

> "To blithely say, as [DHS counsel] articulates, 'Well if it doesn't work, you know, oh, we'll be dealing with that quickly,' which means another removal.

> "The Court is bothered by that.

"The Court also has concerns that [M] cannot be safely in the care of his mother, due to her mental health issues. And mental health cases always make me very sad, but they're facts of life, and they're facts of life for this child.

"Even with what appears, according to the plan, to be herculean efforts of family and providers.

"It is interesting to me that all of the 'expert' *** providers have expressed, in effect what I would call disapproval with the plan that DHS is articulating, and DHS appears to have disregarded their concerns.

"I'm not disregarding their concerns.

"The Court finds there is no compelling reason, on the totality of these circumstances, that a termination of parental rights petition should not be filed.

"I am changing the permanent plan to adoption, and that is in [M's] best interest."

On appeal, mother challenges the juvenile court's change in permanency plan from reunification to adoption on several grounds. Mother's primary contention, as we understand it, is that the juvenile court erred in concluding that, despite reasonable efforts by DHS, mother had not made sufficient progress to make it possible for M to safely return home, ORS 419B.476(2)(a).[6] Alternatively, mother cites compelling reasons—namely, her participation in services and the bond between mother and M—for the court to decline to change the permanency plan, ORS 419B.498(2)(b). Mother finally contends that the failure by DHS to provide services earlier in the dependency case is a reason to forgo implementing a permanency plan of adoption, ORS 419B.498(2)(c).

We turn to an overview of the applicable law governing permanency hearings. ORS 419B.476(2)(a) provides:

"If the case plan at the time of the hearing is to reunify the family, [the juvenile court must] determine whether the Department of Human Services has made reasonable efforts *** to make it possible for the ward to safely return

---

[6] On appeal, DHS joins mother only in her first argument, under ORS 419B.476(2)(a).

home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

"Thus, if the case plan at the time of the hearing is to reunify the family, ORS 419B.476(2)(a) requires proof at the permanency hearing of reasonable efforts by DHS *and* proof of insufficient progress by the parents to allow the child to return home in order to obtain a permanency plan of adoption." *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 423-24, 180 P3d 39 (2008) (internal quotation marks and brackets omitted; emphasis in original). "The particular issues of parental unfitness established in the jurisdictional judgment provide the framework for the court's analysis of each question—that is, both DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction." *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012) (citing *State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 515, 209 P3d 810 (2009)).

Additionally, if the juvenile court changes the permanency plan to adoption, pursuant to ORS 419B.476(5)(d), the court's order "shall include * * * the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable." ORS 419B.498(2) provides the following exceptions, relevant here, to DHS's mandate to file a petition to terminate parental rights:

"(b)   There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

"(A)   The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c);

"(B)   Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships; or

"* * * * *

"(c)   The department has not provided to the family of the child or ward, consistent with the time period in the case plan, such services as the department deems necessary for the child or ward to safely return home, if reasonable efforts to make it possible for the child or ward to safely return home are required to be made with respect to the child or ward."

We have previously explained that

"[t]he requirement in ORS 419B.476(5) that the juvenile court make the determination under ORS 419B.498(2) after a permanency hearing reflects that the legislature has expressed its [intention] that the trial court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child. That child-centered determination under ORS 419B.498(2) requires the court to determine whether it is in the child's best interests *not* to file a petition for termination because the child can be returned home within a reasonable time."

*Dept. of Human Services v. M. H.*, 266 Or App 361, 367, 337 P3d 976 (2014) (internal quotation marks, citations, and ellipses omitted; emphasis in original).

With that context in mind, we discuss the juvenile court's determination that mother had not made sufficient progress to make it possible for M to safely return home. It is undisputed that, in the time between the December 2014 and August 2015 permanency hearings, mother engaged in a number of services and made some meaningful progress. However, a parent's "'[m]ere participation in services * * * is not sufficient to establish adequate progress toward reunification.'" *Dept. of Human Services v. N. S.*, 246 Or App 341, 351, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) (quoting *State ex rel Dept. of Human Services v. S. L.*, 211 Or App 362, 372, 155 P3d 73 (2007)); *see also Dept. of Human Services v. R. S.*, 270 Or App 522, 528, 348 P3d 1164 (2015) ("[A] court's determination that the permanency plan should be changed because a parent has not made sufficient progress to make it possible for the ward to safely return home is not necessarily inconsistent with a determination that the parent has made 'sufficient progress' towards meeting expectations."). Rather, the sufficiency of a parent's progress toward reunification

is analyzed with reference to the bases for juvenile court jurisdiction—in this case, mother's mental-health problems and inability to safely parent M.

The juvenile court changed the permanency plan to adoption based on two related premises. First, relying on the opinions of mother's service providers, the court found that mother had failed to make sufficient progress to make it possible for M to safely return home. Second, the court concluded that mother had made insufficient progress to effectuate DHS's proposed safety plan, which, according to the court, disregarded providers' concerns that mother was incapable of safely parenting M. In reaching those conclusions, the court relied on evidence in the record that, notwithstanding mother's participation in classes and services, providers expressed significant concerns about her parenting abilities as late as August 2015. The record also includes reports of mother's failure to develop a parental role with regards to M, lack of knowledge as to how to meet M's needs, inability to independently care for herself and M on a day-to-day basis, and a continuing lack of insight into the cause of, and conditions leading to, DHS's involvement with the family. Those deficits are especially significant where, as here, mother has a history of "successfully" engaging in services for a period of time but later allowing circumstances to deteriorate. Given that one of the jurisdictional bases was mother's inability to safely parent despite prior participation in services, the evidence before the juvenile court was sufficient to support its determination that mother had not made sufficient progress to allow M to safely return home.

Nor are we persuaded that the in-home safety plan proposed by DHS compelled a different outcome. It is true, as mother points out, that the ability to parent a child independently is not a legal requirement for finding that a parent has made sufficient progress toward reunification under ORS 419B.476(2). *See Dept. of Human Services v. A. R. S.*, 249 Or App 603, 605-06, 278 P3d 91 (2012) (concluding that a parent's progress toward reunification may not be conditioned upon a requirement that the parent demonstrate the ability to parent independently). *But see State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 86, 106 P3d 627 (2005) (explaining that "the parent's *inability* to parent the child

independently [must] not work to the detriment of the child") (emphasis added). However, as the cases cited by mother illustrate, we have generally applied that rule to situations where the parent had access to live-in parenting support or permanent, alternative living arrangements. *See A. R. S.*, 249 Or App at 605-06 (juvenile court erred by requiring the mother to be able to parent "without the assistance of child's maternal grandmother, who was child's foster placement and with whom mother (with grandmother's approval and encouragement) wanted to live"); *Dept. of Human Services v. A. H.*, 275 Or App 788, 792-93, 365 P3d 1183 (2015) (accepting DHS's concession that the juvenile court erred in asserting jurisdiction over a child where, by the time of the jurisdictional hearing, the child was placed by DHS with her paternal grandparents, where she would continue to live even without juvenile court jurisdiction or DHS involvement); *Dept. of Human Services v. B. L. J.*, 246 Or App 767, 773-74, 268 P3d 696 (2011) (juvenile court erred in asserting jurisdiction over children where the mother lived with family friends and required their assistance to safely parent).

By contrast, the main component of the plan proposed by DHS in this case required only that members of mother's support network "check in" twice a day to monitor mother's performance of basic parenting functions. The juvenile court was not required to agree with DHS's and mother's view that that would suffice to ensure continuous proper care of M, particularly because DHS acknowledged that a plan requiring similar oversight was implemented previously and failed, leading ultimately to the removal at issue in this case.[7]

In short, we are mindful that mother appears to have made significant progress, and we acknowledge that

[7] Mother cites a number of circumstances which, according to her, ensure the success of the new, in-home safety plan. Those circumstances include (1) mother's consistent medication management since the first permanency hearing; (2) grandmother's status as mother's legal guardian, granting her access to mother's medical records; and (3) the fact that grandmother is listed on mother's lease and has access to mother's home.

Mother's arguments on appeal primarily focus on the improved status of her mental health. And, although it appears that mother has made strides in that respect, the evidence before the juvenile court was that, notwithstanding that progress, at the time of the August permanency hearing, mother remained unable to safely parent M.

DHS evidently believes that mother has done well enough to maintain the permanency plan of reunification. The question before us, however, is whether the juvenile court committed legal error in reaching a different conclusion. On review of the record, we are persuaded that the juvenile court weighed the evidence and that that evidence is sufficient to support the court's conclusion that mother has not made sufficient progress to make it possible for M to safely return home. For similar reasons, we reject mother's argument that her participation in services created a compelling reason to forgo a change in plan to adoption under ORS 419B.498(2)(b)(A). *See R. S.*, 270 Or App at 531 (the juvenile court could properly determine that, "although mother was making some progress, it was not reasonable to wait [longer] to change the permanency plan") (internal quotation marks and citations omitted).

We next turn to mother's argument that the bond between her and M was a compelling reason, under ORS 419B.498(2)(b)(B), for the court to decline to change the permanency plan to adoption. Mother contends that "it was undisputed that [M] was bonded to mother and that they had a loving relationship," and consequently, a plan other than adoption, is better suited to protect that relationship. Although we have yet to decide whether the bond between a parent and a child can serve as a compelling reason to decline pursuing termination, *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 295, 359 P3d 425 (2015), we find it unnecessary to do so here. First, we note that, at the permanency hearing, M expressed his desire to live with the foster parents for the remainder of his childhood. *Cf. id.* (concluding that child's "opposition to adoption at age six" and desire to continue the parent-child relationship did not establish what was in the best interests of the child under ORS 419B.498(2)(b)(B)). Additional evidence in the record suggests that M had developed a strong attachment to his foster family and that separation from that family was a source of concern for M.[8] Moreover, reports from mother's

---

[8] At the permanency hearing, Tannler testified that M's foster mother had reported that M was "clingy" and "whiny" after he returned from visits with mother and that, following such visits, M worried whenever his foster mother left the room.

providers indicated that mother's role remained that of "a friend, a peer, and a play partner" rather than a parent. Thus, the evidence is legally sufficient to support a determination that the bond between mother and M was not a compelling reason to avoid changing the permanency plan under ORS 419B.498(2)(b)(B).

Finally, we reject mother's contention that the failure by DHS to provide services to mother in the first half of the dependency case constituted a circumstance under ORS 419B.498(2)(c) to forgo a change in permanency plan. Again, at the first permanency hearing held in December 2014, the juvenile court determined that DHS had not made reasonable efforts to make it possible for M to return home during the time that mother was in jail, and later, receiving treatment at OHSU and Telecare. That earlier determination, however, does not establish conclusively and permanently that DHS has not made "reasonable efforts to make it possible for the child * * * to safely return home." ORS 419B.498(2)(c). Put differently, that the department's efforts were not reasonable during one time period does not necessarily establish that the department's *overall* efforts— including its later efforts—were unreasonable. Mother does not contend on appeal that DHS failed to make reasonable efforts toward reunification after the first permanency hearing, nor does she contend that DHS's overall efforts, throughout the life of the case, were lacking. Accordingly, mother's argument under ORS 419B.498(2)(c) is unavailing.

For the foregoing reasons, we conclude that the juvenile court did not err when it changed the permanency plan for M from reunification to adoption.

Affirmed.