DeVORE, J.
*210 Father appeals from a judgment in which the juvenile court changed the permanency plan for C, his son, from reunification to adoption. Father challenges the court's determination that there was no compelling reason to determine that filing of a petition to terminate parental rights would not be in the best interests of the child. Father contends that a compelling reason exists. He contends that another permanent plan-guardianship-is better suited to meet the needs of the child. DHS contends that guardianship is not a compelling reason to forgo a termination petition due to concerns about the suitability of the guardian father suggests. Because we conclude that there was sufficient evidence to support the trial court's determination, we affirm.
We view the evidence in the light most favorable to the juvenile court's disposition; we view the evidence as supplemented by permissible derivative inferences; and we assess whether, when so viewed, the record was legally sufficient to permit that outcome.[1] Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013).
*587 In September 2014, C was four years old when DHS took him into protective custody after a man was stabbed in mother's home in a dispute over illegal drugs. Police found signs of methamphetamine use and clutter well below community standards.[2] In November 2014, the juvenile court took jurisdiction because father was then incarcerated and unavailable to parent due to his violent and impulsive behavior, because mother's substance abuse interfered with her ability to parent safely, and because mother exposed C to an unsafe living environment where he had access to illicit drugs and paraphernalia, and he had exposure to criminal activities and unsafe persons. When the court held its most recent permanency hearing in December 2017, C had been *211 in substitute care for 15 of the most recent 22 months.[3] At that time, C was eight years old and had been a ward of the court for four years.
At school, C is significantly behind his peers academically. He is on an individualized education plan for speech, reading, and behavior. His problem is not cognitive delays but behavioral issues. He is described as "a child that is angry and often views the world as a negative place." When told "no," his tantrums include yelling, crying, and hitting or kicking. C is engaged in weekly counseling. In a mental health assessment, concerns about C include his irritability, inability to concentrate, hyperactivity, and bed-wetting. C was diagnosed with adjustment disorder, as evidenced by emotional and behavioral symptoms. Continued assessment for posttraumatic stress disorder and attention deficit/hyperactivity disorder was recommended. In its report to the court at the most recent permanency hearing, DHS summarized that C needs permanency. DHS reported, "He needs to be able to bond and form healthy attachments to his long-term caregivers given the unavailability of his parents."
In September 2014, when C was removed from his home, he was placed in relative foster care with DG, his maternal grandmother.[4] In its Child Welfare Case Plan, DHS reported that the grandmother "has an unrealistic negative view of [C]." DHS elaborated:
"Of considerable concern, is maternal grandmother's overall negative view of [C]. It would appear he was targeted when he lived in the home while his older sister is the favored child. Maternal grandmother has not responded in an appropriate manner to [C's] behaviors such as urinating in his bedroom. Maternal grandmother, admittedly forced him to sleep on the laundry room floor for several nights as punishment. She does not have good insight into trauma responses and believes [C] did this on purpose and does not *212 see this as the trauma response that it is. [C] has made concerning disclosures regarding his maternal grandmother's discipline techniques such as cold showers and spankings, none of which are within certification standards."
In 2016, the grandmother told a mental health examiner that she was convinced that, when C does not get his way, he deliberately wets himself or urinates on the floor. At trial, the grandmother testified that putting C in the laundry room "was his punishment" for urinating in his bedroom, and it was only one night. The grandmother said that C does get in a lot of trouble and does do a lot of things wrong at school. The grandmother said that she told him that there is nothing worse than a liar, because he is "always lying." The grandmother testified that, despite the report that she treats C unfairly or contributes to his low self-esteem, she treats C with love.
*588 C remained in grandmother's care for over two years. During that time, DHS noted that C "suffered abuse/trauma by his grandmother who has an overly negative view of [C] and his functioning."[5]
In December 2016, DHS placed C in father's care for a "trial reunification." Also in December 2016, the court entered a permanency judgment that contemplated that further efforts would make it possible for C to safely return to father's care. An earlier psychological evaluation of father had diagnosed him with antisocial personality disorder, methamphetamine use disorder in remission, and alcohol use disorder in remission. The examiner's primary concerns were father's "limited problem-solving ability and his impulsive and irresponsible behavior that has led to incarcerations." After his release from prison, father participated in services including drug and alcohol treatment, parenting classes, and working with a parent mentor. C did "well with his father," who was consistent in taking C to school; and father was responsive to the recommendations of the school and therapists. C had fewer behavioral problems and stopped wetting the bed.
In June 2017, father relapsed and was arrested. Father was accused of driving while under the influence of *213 intoxicants (DUII), discharging a gun while driving, and being a felon in possession of a firearm. He was convicted of DUII and two counts of felon in possession. He was incarcerated again, now 350 miles from C, and his earliest release date is in July 2022. In the Child Specific Case Plan, DHS observed that father's "incarceration has been challenging for [C] as he is very much bonded and attached to his father."
As a result of father's inability to provide a home, C was placed with KG, a maternal cousin, in June 2017. C was in KG's care about six months before the hearing and most recent permanency judgment. In that time, C developed a "significant bond" with KG. DHS instructed KG that, given the grandmother's "inappropriate discipline practices and negative view of [C]," the grandmother should never be unsupervised with him. That concern became the issue of the recent permanency hearing.
At the hearing, DHS recommended a change of plan from reunification to adoption. DHS observed that, after four years, the case had been open a significant amount of time and that the recommendation for adoption was actually the second time that adoption was proposed. DHS reported that mother had not participated in services needed to make progress to ameliorate the threats of harm to C and that father was unavailable to parent because he would be incarcerated until about July 2022. DHS recognized that father loves his son and wants to be a part of his son's life, but that C has significant behavioral problems and needs a placement that can meet his needs consistently throughout his life. DHS recommended a change of plan to adoption because adoption "is the most permanent, most stable plan that this child can have." Adoption would assure C "the stability and permanency that he needs in order to grow and thrive, which has been a problem." DHS assured the court that C was adoptable. In its report to the court, DHS noted that KG was willing to adopt, but that DHS was also conducting a diligent relative search to identify potential additional relative adoptive resources.
At the hearing, C's attorney took no position on adoption and noted that C is very attached to his father, but also noted that C was starting to comprehend that reunification *214 was not going to be an option for a very long time because his father's earliest release date is in 2022.
At the hearing, father opposed the change of plan to adoption. Because he will be incarcerated some time into 2022, father's "primary preference" is a plan of guardianship. Father recommended KG as the appropriate caretaker for C while father is imprisoned. He reported that KG had agreed to be guardian until not needed.
The court asked father's attorney if there had been any discussion about the possibility of guardianship versus adoption. Father's attorney replied that she had talked briefly *589 about the issue with DHS before the hearing but DHS preferred adoption. The court asked DHS to explain.
DHS counsel Dundon explained that the concern about guardianship with KG stemmed from her noncompliance with child safety plans. Dundon said that KG had "struggled to follow those conditions that DHS has put in place for the child's safety." Although DHS had offered reminders and given admonitions, KG had responded with adversity to the rules for keeping C safe. Dundon said that "there is a real concern" about KG's "ability to follow the rules and requirements necessary to keep the child safe."
KG responded that she was not defiant. She said that each time she talked to DHS, she received in writing a new name of a family member subject to a restriction. She felt that C's family was being "ripped away from him." She did not know what "the charge" was against the grandmother.
Caseworker Nikoleishvili responded that DHS supports family ties but needs to ensure interaction will be safe and beneficial to a child. She explained that DHS needed to ensure that the grandmother was never in a circumstance in which she would provide discipline to C. The reason was that there had been inappropriate and excessive discipline in the past. Supervised visitation was fine. Discipline was a sensitive concern due to C's "challenging behaviors." Nikoleishvili explained that C "has a very negative self-image," believing that he is a "bad child that cannot do right." Nikoleishvili assured the court that DHS had talked with KG about why it was important that the grandmother's *215 visits be supervised. DHS had put it in writing, as well. Nevertheless, there remained a disagreement about "one of the core issues." On one occasion recently, KG had left C in the care of the grandmother while KG traveled to California.
In an oral ruling, the juvenile court found that the safety concerns that led to the court's jurisdiction had not been ameliorated and that adoption was in C's best interests. In its judgment, the court determined that DHS had made reasonable efforts toward reunification; that mother and father had not made sufficient progress; that C could not be safely returned to either parent's care; and that the case plan should be changed to adoption. In addition, the court determined that none of the circumstances described in ORS 419B.498(2) applied because, among other things, there was not a "compelling reason" within the meaning of that statute for determining that filing a petition to terminate parental rights would not be in the child's best interests.
On appeal, father disputes only the court's last determination. He does not dispute that DHS had made reasonable efforts to make it possible for C to safely return home or that the parents had not made sufficient progress to make it possible for C to safely return home. He tacitly concedes those first two prerequisites for a change of plan from reunification to adoption. See ORS 419B.476(2)(a) (setting those criteria). He disputes only the third prerequisite. See ORS 419B.476(5)(d) and ORS 419B.498(2) (no compelling reason not to initiate petition to terminate parental rights). As he would prefer to frame the issue, father contends that DHS "failed to prove that there did not exist a compelling reason to forgo a plan of adoption." He argues that another permanency plan, such as guardianship, is better suited to C's needs. He reasons that maintaining C's bonds with his father and with KG is in C's best interests.
In order to address the particular issue that is presented, we step back to describe the context in which it arises. Generally, it is Oregon's policy to offer appropriate reunification services to parents to allow them the opportunity to adjust their circumstances, conduct, or conditions to make it possible for the child to return home within a reasonable time. When abuse or neglect mean that the best *216 interests of the child require otherwise, the state has an obligation to find or provide an alternative, safe, and permanent home for the child. ORS 419B.090(5).[6] *590 When a child has become subject to the jurisdiction of the juvenile court, the court must make the child a ward of the court. ORS 419B.328. If the court determines it to be in the best interests of the child, the court may place the child in the legal custody of DHS. ORS 419B.337. In most cases, the court must conduct a permanency hearing for a child in foster care no later than 12 months after being found within the court's jurisdiction or 14 months after being placed in substitute care, whichever is earlier. ORS 419B.470(2). At the permanency hearing, the court is required to make certain determinations if the case plan has been to reunify the family. Two of those determinations are those that father concedes. That is, ORS 419B.476(2)(a) provides, in part:
"If the case plan at the time of the hearing is to reunify the family, determine [1] whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and [2] whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."
In addition, ORS 419B.476(5) requires that, within 20 days of the hearing, the court must enter an order making additional determinations. As relevant here, ORS 419B.476 (5)(d) requires that the order include, "[i]f the court determines that the permanency plan for the ward should be adoption, the court's determination of whether one of the *217 circumstances in ORS 419B.498(2) is applicable." That cross-reference involves a petition to terminate parental rights.
Under ORS 419B.498(1), DHS must file a petition to terminate parental rights after a child has been in foster care for 15 of the most recent 22 months, unless one of the circumstances identified in ORS 419B.498(2) applies. It is subsection (1) that makes significant the fact that C has been in foster care for 15 of the most recent 22 months. That is, a petition to terminate parental rights should be initiated unless subsection (2) applies.[7]
Under ORS 419B.498(2)(b), DHS is required to initiate a petition to terminate parental rights as provided in subsection (1), as relevant here, unless "[t]here is a compelling reason, which is documented in the case plan , for determining that filing such a petition would not be in the best interests of the child or ward ." (Emphases added.) Father does not contend that the case plan documents a circumstance as a compelling reason not to initiate a termination petition. And, we are unable to locate anything in the case plan *591 that is documented as a compelling reason against a termination petition. We do observe that C's bond with father is a particular fact that was documented in the Child Specific Case Plan, although that bond is not offered as a compelling reason to forgo a termination petition. We do not *218 consider whether that notation suffices to satisfy the documentation requirement, because we can resolve the case without deciding the meaning or application of the statute's terms requiring documentation in the case plan.[8]
With that said, the dispute in this case reduces to the "no compelling reason" requirement, as determined by the juvenile court and as reviewed by us on appeal. Under ORS 419B.498(2)(b), compelling reasons include, but are not limited to:
"(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]"
As noted in earlier cases, we observe that the court has yet to determine that the statute, referring to the child's sibling attachments, concerns the bond between parent and child. See, e.g., Dept. of Human Services v. C. M. E. , 278 Or. App. 297, 311, 374 P.3d 969 (2016) (not deciding issue); Dept. of Human Services v. T. M. S. , 273 Or. App. 286, 295, 359 P.3d 425 (2015) (assuming without deciding). Because ORS 419B.498(2)(b) describes compelling reasons as including, "but not limited to" paragraphs (A), (B), or (C), we again assume without deciding that father's bond with C could be found by a juvenile court to be a compelling reason to conclude that a termination petition would not be in C's best interests.
Resolution of the "no compelling reason" issue is determined differently in the juvenile court and on appeal. In the juvenile court, the issue presented was whether C's bond with father is a compelling reason to conclude that a *219 termination petition was not in C's best interest, given all the circumstances, including but not limited to, the parents' failure to make sufficient progress, the reasonable efforts of DHS at reunification, the "paramount concerns" for the child's health and safety, and the length of time in foster care. Assuming that we do not undertake de novo review on appeal, we review a permanency judgment for sufficient evidence; we do not substitute our judgment for that of the juvenile court; and we do not evaluate the persuasive value of conflicting evidence. See N. P. , 257 Or. App. at 639-40, 307 P.3d 444 (appellate review does not allow this court to substitute its judgment for that of the juvenile court's assessment of the persuasiveness of the evidence; instead appellate review is limited to determining whether the record was sufficient to permit the outcome).
As a trial court, the juvenile court did its part. The juvenile court made an express determination in its judgment that "there is not a 'compelling reason' within the meaning of that term in ORS 419B.498(2)(b) for determining that filing a petition to terminate * * * parental rights would not be in the child's best interests[.]" At the hearing, the evidence that was received was directed to that specific question, because there was no dispute as to other issues and because the court directed DHS to explain why DHS had concerns about father's preference for a guardian-particularly the guardian whom father proposed. At least in this instance, no further explanation is needed for appellate review.[9] The juvenile court made its required *592 conclusion under ORS 419B.476(5)(d)"whether one of the circumstances *220 in ORS 419B.498(2) is applicable." (Emphasis added.) In its judgment, the court appropriately stated that none of the circumstances in ORS 419B.498(2) was applicable. The only potential "compelling reason" would have been if another permanent plan-guardianship-would have been better suited to meet the needs of the child. See ORS 419B.498 (2)(b)(B) (one of three listed "compelling reasons"). However, after hearing the evidence, the juvenile court concluded that it would change the plan from reunification to adoption "in the interest of permanency and in the best interest of the child."
For our part, we conclude that there is sufficient evidence from which the juvenile court could conclude that there was no "compelling reason" that a termination petition was not in C's best interests. Due to her problems, mother was not a parental resource. Although father had been successful with C, father would be imprisoned until July 2022. By the time of the hearing, C had been a ward of the court for four years. He had been in foster care for 15 of the most recent 22 months. Father proffered, as a guardian, KG, C's cousin. DHS, however, provided information that KG had not followed the child's safety plan, and, despite verbal reminders and written instructions, she resisted the plan's directions. To hear their perspectives, the juvenile court elicited colloquy with both KG and the grandmother. Doing so, the court could assess their demeanor.[10] In her remarks, KG insisted that she had C's best interests at heart, but she did not deny that the dispute over the safety plan existed. Instead, KG characterized DHS as imposing one restriction after another, taking family members away from C. DHS responded that it had explained to KG the risks that the grandmother posed to C, yet KG said that she did not know why DHS deemed the grandmother to be a problem.
In considering that controversy, the court observed that it was "not deaf to or ignoring the tension in the courtroom or the statements of the foster mother or the grandmother-or the caseworker, frankly." In all that, the court *221 had evidence that the grandmother, who had cared for C for two years, employed discipline inappropriate to C's vulnerability (i.e. , spanking, cold showers, criticism, and night in the laundry room). The court also had evidence that the proposed guardian failed to appreciate that problem, had disregarded the safety plan, and, even in her own testimony before the court, demonstrated her resistance to the safety plan.[11]
Taken together, the record provides sufficient evidence to support the court's conclusion that there was not a "compelling reason" to determine that a termination petition was not in C's best interests. That is, the proposed guardianship, which presumably was offered to preserve C's relationship with father, was not better suited to meet C's health and safety needs, when father will be imprisoned until at least July 2022 and when, at *593 this moment, C needs to bond and form healthy attachments to a long-term caregiver. The proposed guardianship was not better suited to meet C's needs, given the parents' lack of progress, the reasonable efforts of DHS, the "paramount concerns" for C's health and safety, and his extended time in foster care. See ORS 419B.476 (2)(a) (reasonable efforts, insufficient progress, and paramount concerns for child's health and safety); ORS 419B.476(5)(d) (whether circumstances of ORS 419B.498(2) apply); ORS 419B.498(1) (termination petition may be triggered if 15 of last 22 months in foster care); ORS 419B.498(2) (termination petition unless there is a compelling reason that it is not in best interests of the child); C. M. E. , 278 Or. App. at 311-12, 374 P.3d 969 (sufficient evidence supported determination that bond between child and mother was not a compelling reason to forego a termination petition and adoption); T. M. S. , 273 Or. App. at 295-96, 359 P.3d 425 (sufficient evidence supported determination that bond between child and mother was not a compelling reason to forego a termination petition *222 and adoption); cf. Dept. of Human Services v. J. M. T. M. , 290 Or. App. 635, 638-39, 415 P.3d 1154 (2018) (because DHS presented no evidence about guardianship, there was insufficient evidence to support juvenile court's "no compelling reason" determination).
The dissenting opinion rejects the majority's conclusion. It rejects out of hand the reason DHS offered for adoption over other alternatives. 294 Or. App. at 226 (Ortega, J., dissenting) (DHS reason "has no evidentiary significance"). As noted, DHS explained that adoption "is the most permanent, most stable plan that this child can have." (Emphasis added.) DHS explained that adoption would assure this child with adjustment disorder "the stability and permanency that he needs in order to grow and thrive, which has been a problem." The permanency judgment recited that it was made in consideration of the "exhibits admitted by the court" and the "[u]nsworn statements of and on behalf of the parties." One of those statements was the reason to prefer adoption that was urged by DHS. See ORS 419B.325(2) (testimony, reports, or other material relating to ward may be received by juvenile court without regard to their competency or relevancy under the rules of evidence); OEC 101 (4)(i) (providing that OEC 100 to 412 and OEC 601 to 1008 do not apply to proceedings to determine the disposition of a child under ORS 419B.325(2) ).
That reason, given in support of this change of plan, does not "functionally presume" that adoption or a termination petition "is the best plan for every child." But see 294 Or. App. at 224 (Ortega, J., dissenting). Instead, the reason that DHS gave for adoption over other alternatives provides a basis for the juvenile court's decision for this child. That general reason, made specific to C's needs, responds to the general concept of guardianship that the dissent would prefer. That reason means that there was not stone silence or a total lack of information about adoption versus the general concept of guardianship. Although DHS could have elaborated upon its reason with more information to make it more persuasive, our role is not to determine whether we are persuaded that DHS met a burden of proof, because that is the role of the juvenile court. Our role, viewing the evidence in the light most favorable to the disposition chosen, is only to *223 determine whether the juvenile court had sufficient evidence for its disposition. N. P. , 257 Or. App. at 639, 307 P.3d 444.
As happened here, the juvenile court addressed the actual form of guardianship that father urged in the juvenile court. As noted, father urged a temporary guardianship with KG until his release from prison. The juvenile court gave father's requested form of guardianship meaningful review. On this record, the juvenile court could conclude that the form of guardianship that father sought was contrary to the evidence that C now needs to form a lasting bond with a long-term caregiver. The juvenile court could also conclude that a guardianship, which would be revisited upon father's eventual release, would leave C in what would amount to protracted foster care for yet another four critical years of his life-then to be disrupted just as C is about to become a teenager.
The dissent underscores the bond that C had with father during a past six-month period *594 before the subsequent six-month placement with KG. Given father's argument and the DHS reports, the juvenile court was well aware of that bond, as balanced against other circumstances. Because we must assume that the juvenile court made implicit findings consistent with its conclusion, we must assume the juvenile court to have concluded that guardianship of any sort-whether temporary or permanent-could do little to avoid the effects on that relationship due to father's separation from incarceration 350 miles away.
Our conclusion does not shift a burden of proof to father but recognizes, instead, that DHS offered a reason to prefer adoption over other alternatives in general and offered reasons to disfavor the form of guardianship that father propounded in particular. As the juvenile court concluded, the record provided evidence to support a change in the plan from reunification to adoption "in the interest of permanency and the best interest of the child." (Emphasis added.)
For all of those reasons, we affirm the judgment of the juvenile court changing the permanency plan from reunification to adoption.
Affirmed.

The parties have not asked us to exercise our discretion to review this case de novo , and this is not an exceptional case warranting such review. See ORS 19.415(3)(b) (court has discretion to conduct de novo review in equitable cases); ORAP 5.40(8)(c) (de novo review appropriate only in exceptional cases).

DHS had been involved with C in 2011, when father fired several rounds from a firearm outside mother's home while she and C were inside. Also, the agency had been involved in 2012 when police raided the home in search of a suspect. The home lacked water and electricity, and drug paraphernalia was found.

As we explain below, under ORS 419B.498, this length of time in substitute care may become one of the triggers for a petition to terminate parental rights and approve adoption.

To be more precise, the placement was with both grandparents, but the grandfather died in April 2017, and only grandmother is relevant to the placement history.

In March 2016, the court changed C's permanency plan from reunification to adoption. Father appealed, and that earlier permanency judgment was affirmed without opinion.

More precisely, ORS 419B.090(5) provides:
"It is the policy of the State of Oregon, in those cases not described as extreme conduct under ORS 419B.502, to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time. Although there is a strong preference that children live in their own homes with their own families, the state recognizes that it is not always possible or in the best interests of the child or the public for children who have been abused or neglected to be reunited with their parents or guardians. In those cases, the State of Oregon has the obligation to create or provide an alternative, safe and permanent home for the child."

Those provisions, ORS 419B.498(1) and (2) were adopted in order to comply with the Adoption and Safe Families Act of 1997 (ASFA), 42 U.S.C. §§ 671, 675, which Congress enacted to reduce the time that children spent in foster care. See Or. Laws 1999, ch. 859, §§ 20, 21 ("[R]elating to the implementation of the Adoption and Safe Families Act of 1997"); Staff Measure Summary, Joint Committee on Ways and Means, S.B. 408A, May 18-19, 1999 ("The bill is intended to conform Oregon law to [ASFA]."); see also Tape Recording, Senate Committee on Judiciary, S.B. 408, Mar 10, 1999, Tape 68, Side A, and Tape 69, Side A (Testimony of Steve Christian, Senior Policy Specialist, National Conference of Statute Legislatures). One feature of the federal enactment is the time limit that Congress set for a child in foster care. The federal statute requires that, when a child has been in state foster care for 15 of the most recent 22 months, the state shall file a petition to terminate the parental rights unless, among other reasons, the "state agency has documented in the case plan" a compelling reason for determining that termination would not be in the best interests of the child. 42 U.S.C. § 675(5)(E). The limit on protracted foster care resulted from a recognition that placement in foster care is itself detrimental to a child and should be as short as possible. See H.R. Rep. No 105-77, 105th Cong., 1st Sess., Part I(B) at 8 (studies show the average child removed from home because of family problems spends almost three years in foster care) and Part II at 12 (exception to termination petition if case plan documents a compelling reason to the contrary).

Father argued to the juvenile court that his "primary preference" was guardianship, which he explained by referring to C's improvement in behavior while in father's custody. That argument could be understood to suggest that (a) father is simply a better caregiver, rather than to suggest that (b) C's bond with his father makes guardianship in C's best interest. Asserting such a distinction, the state argues that father failed to preserve error as to any argument about "no compelling reason" under ORS 419B.498(2)(b)(B) because the two arguments are significantly different. We note that father argued that C "was very much happy to be in the care of his father." We doubt that father's relationship with C was not before the court when father disputed adoption. Therefore, we conclude that father's argument preserved the issue of guardianship as it relates to C's bond with father.

Father did not assign error or argue that the juvenile court failed to explain or make required findings. See ORAP 5.45(1) (a question or issue to be decided on appeal shall be raised in the form of an assignment of error). By contrast, in State ex rel. DHS v. M. A. , 227 Or. App. 172, 175, 205 P.3d 36 (2009), the mother assigned error to the failure of the juvenile court to make specific findings required by ORS 419B.476(5)(a) and (f) when it approved a change of plan from reunification to another planned permanency living arrangement. In those particular provisions, "the statute dictates that the required findings be made." Id . at 182, 205 P.3d 36. Paragraph (5)(a) requires the court to describe the reasonable efforts of DHS, and paragraph (5)(f) requires an explanation, if placement is with a relative, why placement with parents or guardian or adoption is not appropriate. In M. A. , we concluded that the juvenile court had failed to provide a description why it was not in the best interest of the children to be returned home or placed in another permanency option. Id. at 183, 205 P.3d 36. In the case at hand, those provisions, which specifically require added findings, do not apply.

When responding to the notion that she did not have C's best interest at heart, KG described herself as "shaking" in disgust. When the grandmother spoke, the court advised her to "take it down a notch because you're escalating and getting louder and louder, and that just makes it harder to hear."

The dissenting opinion observes that the juvenile court, in its initial findings in the permanency judgment, noted that the child's current placement in substitute care is in the child's best interests. The dissent suggests that it would be inappropriate to understand the juvenile court to make an implicit finding about KG's propriety as a guardian. The court's initial recitals, however, were preliminary recitals that justified the then-current placement of the child in substitute care as an interim measure. Later, the court determined that the child is not being cared for by a relative that is intended to be permanent.